A   A
B   B
C   C
D   D
E   E
F   F
G   G
H   H
I   I
J   J
K   K
L   L
M   M
N   N
O   O
P   P
Q   Q
R   R
S   S
T   T
U   U
V   V

HCA 1492/2018
[2025] HKCFI 408

# IN THE HIGH COURT OF THE
# HONG KONG SPECIAL ADMINISTRATIVE REGION
# COURT OF FIRST INSTANCE

ACTION NO 1492 OF 2018

_____

BETWEEN

NHD SYSTEMS (ASIA) LIMITED (IN LIQUIDATION)    Plaintiff

AND

LI XIAO YI                                     Defendant

_____

Before: Hon Harris J in Court

Dates of Hearing:  14 – 15, 17 October 2024

Date of Judgment: 17 October 2024

Dates of Further Written Submissions:  29 November and 27 December 2024

Date of Reasons for Judgment: 21 January 2025

_____

R E A S O N S   F O R   J U D G M E N T

_____

## Introduction

1. The Plaintiff, which between April 1988 and February 1993 was called Lee Siu-Fung & Co. Limited ("**Company**"), was placed into compulsory liquidation by order of the court dated 9 May 2000.

Defendant's
EX. 11

The first liquidators were Gabriel Tam and Alan Tang of KPMG. In November 2001 Mr Tang left KPMG and subsequently ceased to be one of the liquidators. By an order dated 2 June 2016 Mr Tang was reappointed, together with Terry Kan, as a Liquidator of the Company replacing KPMG. Mr Tang remains a liquidator and gave evidence on behalf of the Company at the trial of the Company's claim, which I explain later. I dismissed the Action on hearing the Defendant's no case to answer submission following close of the Company's case as in my view the claim had clearly not been established. These are my reasons for doing so. However, these reasons goes further than explaining why the Company has clearly failed to prove its claim. Most of it concerns the conduct of the case by Mr Tang, his evidence in his affirmations, witness statements and in cross-examination, the duties of a liquidator and more generally the importance of witnesses taking their obligation to give honest evidence seriously and the damage done to the integrity of the trial process if witnesses do not do so.

*Background*

2. As the brief chronology in the previous paragraph suggests, the claim which I must determine arose many years ago. In June 1992 the Defendant participated in the establishment of Lee Siu-Fung USA Corp ("**SF Corp**"). At the time he was resident in Ann Arbor in Michigan having completed his post-graduate education in the United States. He became the principal officer of SF USA. At about the same time he became a director of the Company and also the corporate vehicle, which was subsequently used by his brother (Siegfried) to undertake an initial public

offering as the holding company for the business group of which the Company formed part.

3. Following his reappointment as the liquidator Mr Tang became aware of the following documents amongst the records of the Company:

(1) A document headed "Loan Agreement" dated 1 July 1992 and signed by Siegfried in which the Defendant is named as the borrower of a loan of US$1 million, but which the Defendant has not signed. The document provides that in exchange for the loan the Company would own 50% of SF USA. It also provides that "*The Loan will carry a term of 20 years with 5% interest and repayment of this loan will be initiated 5 years after the execution of this agreement.*"

(2) A fax dated 18 August 1992 from the Defendant to Angela Chan said to consist of 4 pages attaching an unsigned consent of directors authorising the Loan and a copy of the Loan Agreement, which neither party had signed. What the Company has produced only consists of 3 pages. It is unclear what the 4th page was, assuming that 4 pages were sent and the cover page is not incorrect in describing the number of pages of which it consisted.

(3) A signed copy of the consent of directors to the Loan.

(4) A letter or fax signed by Daniel Chan, the accounting manager of the Company, dated 9 September 1992 to the Defendant enclosing a copy of the Loan Agreement, the consent of directors, the Company's articles of incorporation and certificate of incorporation, the Company's last 5 years of financial statements and copies of the Company's brochure.

4. In 2017 Mr Tang asked the Defendant for an explanation for the transaction he assumed was recorded in these documents. This was some 25 years after the date of the Loan Agreement. Dr Li said he could not recall how the matter had developed, but he did not think that he had received a loan. If the loan contemplated in the Loan Agreement had not been concluded in my view it would be unsurprising that after such a long period Dr Li would have little recollection of it and would have retained no relevant documents. The obvious thing for Mr Tang to have done would have been to ask his staff to check the documents, consisting of 350 box files, of which he had come into possession when he was reappointed as liquidator to see if the Company's ledgers or bank statements showed the loan contemplated by the Loan Agreement that Dr Li had never signed being advanced. Mr Tang did not do this. It was his evidence that he was advised that the documents to which I have referred were sufficient to prove that Dr Li owed the Company US$1 million plus interest. The Company issued the present proceedings by writ on 27 June 2018.

*The Claim*

5. The Amended Statement of Claim pleads that Dr Li accepted the terms of the Loan. Agreement in paragraph 5 as follows:

> "On 16th September 1992, the Defendant acknowledged receipt Mr. Chan's letter of 9th September 1992, including consent from all directors of the Plaintiff for execution of 'a loan agreement reached by Lee Siu-Fung & Co. Ltd (name of Plaintiff at the time) and Dr. Xiao Yi Li dated 1st July 1992 and to provide Dr. Xiao Yi Li a personal loan in the amount of US$1,000,000 'in exchange. for 50% ownership of Lee Siu-Fung USA Corp' ('**Personal Loan**'). The Defendant, by acknowledging and receiving the documents aforesaid is deemed to have accepted the terms and conditions stated therein. This loan 'will carry a term of 20 years with 5% interest and 'repayment' of this loan will be initiated from 5th years after the execution of this Loan

agreement. The Defendant, by his subsequent conduct, acted on the terms and effects of the Loan Agreement."

6. In paragraphs 6 and 7 of the Amended Statement of Claim there is reference to further documents, but they do not refer to the loan, they concern the setting up of SF USA and the funding of its capital.

7. In his Re-Amended Defence Dr Li pleads that his primary position is that he no longer recalls the matters referred to in the Amended Statement of Claim. Dr Li denies that the documents relied on by the Company prove that he had agreed to take a loan from the Company or that he had in fact received one. His defence was buttressed by the argument that the Company was a subsidiary of Siu Fung Ceramics Holdings Limited in 1993 when it was listed. Dr Li was a director at that time of both the Company and Siu Fung Ceramics and this being the case any outstanding loan to him should have been recorded in the audited consolidated financial statements of Siu Fung Ceramics included in the prospectus for Siu Fung Ceramics's initial public offering in 1993. It was not. Mr Tang agreed, after pressing, in cross-examination that this was correct. The obvious inference to be drawn is that at the time of the IPO Dr Li did not owe the Company anything.

8. In his first witness statement made in October 2021 Dr Li explains that he does not recall a loan being advanced to him by the Company in 1992. He points out that it is surprising that the Company has not produced any accounting documents such as ledgers or audited or unaudited accounts, which support the claim. He also points out that if the Loan Agreement has been made then 50% of the shares in SF USA should

- 6 -

have been transferred to the Company. There is no evidence of this taking place.

9. In his supplemental witness statement Dr Li explains that to the best of his recollection the initial funding for SF USA was provided by his Parents. Although, Dr Li did not give evidence and, therefore, I have no regard to this evidence in assessing the Company's claim, it is relevant in so far as it alerted Mr Tang to a possible, and exculpatory, explanation why the Loan Agreement was not signed by Dr Li and he did not recall receiving a loan. It was an additional reason to consider carefully whether the claim had merit. Plainly Mr Tang should have investigated the matter further to see whether the banking records and the accounts of the Company shed further light on whether or not a loan had been advanced. As this is a writ action the parties undertook general discovery and as part of that process Mr Tang should have caused a search for such documents to have been undertaken. It was his evidence that he did not. His excuse was that he did not understand that the Company's discovery obligations required him to do so. I will return to this matter in some detail later. Suffice it to say that I do not accept Mr Tang's evidence, which I am of the view was, like much of the rest of it, dishonest.

10. In the absence of any evidence other than the documents I have referred to in **[3]** and, the Company's formulation of its claim in **[5]** of the Amended Statement of Claim, what I have to determine is whether by acknowledging receipt of the documents enclosed with the letter of 9 September 1992, Dr Li became bound by the Loan Agreement and is liable to pay the amount of the loan, to which the Loan Agreement refers. The principles on implying a contract by conduct are well established and

are to be found in the decision of the Court of Final Appeal in *Shanghai Tongji Science & Technology Industrial Co Ltd v Casil Clearing Ltd*[1] and the judgment of Ribeiro PJ. They can be summarised as follows:

(1) The burden of establishing such a contract is on the party asserting its existence. The Court will not imply such a contract lightly: *Shanghai Tongji* [38].

(2) It is necessary to show that the conduct relied upon is "unequivocally referable" to the alleged contract sought to be inferred, in the sense that the conduct is consistent only with there being the contract sought to be implied and inconsistent with there being no such contract: *Shanghai Tongji* [38]-[39]. It will be fatal to the implication of a contract if the parties had or might have acted exactly as they did in the absence of a contract: *Shanghai Tongji* [38], referring to *The Aramis*[2].

(3) The requirement of unequivocally is such that it is not enough to show that the parties have done something more than, or something different from, what they were already bound to do under obligations owed to others. What they do must be consistent only with there being a new contract implied, and inconsistent with there being no such contract: *Shanghai Tongji* [39], [48].

11. Although the documents indicate that at some point in time the parties envisaged the possibility of a loan being advanced to Dr Li, their language and the manner in which they came to be exchanged do not demonstrate that the discussions resulted in a concluded agreement. They are clearly equivocal and are as consistent with an agreement having been

---

[1] (2004) 7 HKCFAR 79.
[2] [1989] 1 Lloyd's Rep 213, 224 (Bingham LJ).

discussed and then abandoned as they are consistent with an agreement being concluded and a loan advanced.

12. In these circumstances, I invited Mr Man to consider making a no case to answer submission, which he did. I have recently explained the how the court should deal with a no case to answer submission in *Re T-Hero Industrial Company Ltd*[3]. It is a two-stage process: **First**, the court will determine whether the plaintiff has demonstrated a *prima facie* case for the defendant to answer; and, if so, **secondly**, the court will then decide whether the plaintiff's case is established on the balance of probabilities, having regard to (a) the plaintiff's evidence and (b) the available documentary evidence, but without regard to the defendant's witness statement.

### *Disposition*

13. In my view even assuming that the Company demonstrated a *prima facie* case (in my view it did not) it is clear that its evidence has failed to prove its case on the balance of probabilities and I so find[4]. Not only are the documents relied on by the Company equivocal I agree with Mr Man that the absence of any reference to a loan in the financial statements, which formed part of the prospectus for the IPO is consistent with such a loan not having been advanced, which Mr Tang, who is, of course, an accountant conceded during cross-examination. No reason has been advanced by the Company for the loan having been omitted if it had been made and was outstanding. A loan to Dr Li's brother, who was an

---

[3] [2023] HKCFI 3118, [29]–[32].
[4] Although I had read Dr Li's witness statement prior to the trial I have had no regard to his evidence in determining the matter.

executive director of Listco is disclosed. It seems to me that the obvious inference is that there is no reference to the loan, because it had either never been advanced or had been repaid. Dr Li had pleaded this point in his defence and I would have expected Mr Tang to have looked into it. It was clear from his evidence that he had not done so. Initially in cross-examination he suggested that it was unclear that the Company was a subsidiary of Listco, apparently because he had not bothered to ascertain that Dr Li was correct and that it was included in the schedule of subsidiaries in the prospectus, but under its previous name.

14. I dismissed the Action. Mr Man invited me to reserve the costs. Mr Man did so in order that consideration could be given by Dr Li's legal team for applying for a costs order against Mr Tang personally or possibly the litigation funder, who it became apparent during Mr Tang's cross-examination had funded the litigation. I reserved the costs. As I indicated at the end of the trial, I am inclined to order that the costs are paid on an indemnity basis given the Company's conduct, in practice Mr Tang's conduct, of the claim. It is that conduct and Mr Tang's evidence which I now turn to consider in detail.

**Mr Tang**

15. The court expects and requires the parties to litigation to conduct legal proceedings honestly and in accordance with the rules on which they should be properly advised by their lawyers. Witness evidence and cross-examination are a central feature of the trial process and it is difficult to envisage a witness, who does not understand that they are meant to tell the truth even if they fail to do so whether out of a conscious decision to lie or because of unreliability of memory or psychological factors that

influences how they recall or interpret past events. One category of litigant and witness in particular should be under no illusion about what is required: the Court's own officers. The Court's officers should also appreciate that the standards expected of them goes further than strict compliance with the rules. By virtue of the office that they hold, they are expected to carry out their duties fairly and with integrity. David Richard LJ (as he then was) explains this in *Lehman Brother Australia Ltd (In Liquidation) v MacNamara*[5]:

> "The principle established by the decision of the Court of Appeal in *Ex parte James* is that the court will not permit its officers to act in a way which, although lawful and in accordance with enforceable rights, does not accord with the standards which right-thinking people or, as it may be put, society would think should govern the conduct of the court or its officers. The principle applies to a failure to act, as much as to positive acts……. As a public authority and given its role in society, the court is expected to apply standards to its own conduct which may go beyond bare legal rights and duties."

16.    I agree with Mr Man that if one of its officer's conduct appears to fall short of these standards, and particularly if it appears that an officer of the Court had not complied with fundamental legal rights and duties, the conduct should be scrutinised by the Court and that it is in the public interest that the conduct is made public in a judgment of the Court.

17.    At the end of the trial, I informed counsel that I would call for a transcript of Mr Tang's evidence in order and invite further submissions in order to ensure that my assessment of his evidence was based on an accurate record of what he said. What follows has been prepared with the benefit of the transcript and further submissions. It addresses the

---

[5]   [2021] Ch 1, [35].

Company's (in practice Mr Tang) breach of the Company's disclosure obligations, and Mr Tang's failure to advance the claim fairly.

18. Mr Tang was appointed as special manager on 9 May 2000 i.e. some 5 months prior to his appointment as one of the Liquidators on 27 October 2000. Therefore, prior to his resignation in November 2001 and reappointment in 2016, Mr Tang would already have had at the very least, 13 months to conduct investigations into the affairs of the Company.

19. Mr Tang accepted that the standard operating practice for experienced liquidators upon appointment as liquidator of a company would be to obtain the accounts of that company. He also accepted that this would have "likely" taken place during the first 13 months following his appointment, and that the accounts could have been readily obtained from the auditors of the Company and hence were within the liquidators' power to obtain.

20. Accordingly, the Company's audited accounts (at least those between 1993 and 2000) were very likely to have been secured by the Liquidators (whether by Mr Tang or his successors) at some stage around 2000, and at the very least before 2018. Further, they are likely to have been within the 350 boxes of documents secured by Liquidators following their appointment, which Mr Tang accepted have been in their possession since 2000, some 18 years prior to the commencement of these proceedings. Consequently, the Company's accounts for at least 1993 to 2000 (and indeed, other documents relevant to these proceedings) are very likely to have been in Liquidators' possession, custody or power since 2000.

21. Notwithstanding the above, the Liquidators took a deliberate decision not to review the 350 boxes of documents to identify (let alone disclose) all the relevant documents:

   (1) Mr Tang explained that he did not go through the documents "in any great detail" due to lack of funding and as those documents were "disorganised".

   (2) He also said he took a "commercial decision" not to investigate in any detail as he thought he had sufficient evidence to bring the claims herein.

22. I agree with Mr Man that this explanation is disconcerting. It resulted in an officer of the Court affirming that he has breached discovery obligations for "commercial reasons". Upon being pressed during cross-examination, Mr Tang accepted that the Company had failed to disclose all relevant documents in its possession, power and custody and that the scope of discovery obligations was not excused by the Liquidators' lack of funding. While he stopped short of expressly admitting that the Company had breached its discovery obligations by failing to go through the 350 boxes of documents to locate the Company's accounts and ledgers , it is plain that he has no answer to the suggestion that he did. This is clearly a case where the Court has knowingly not been presented with a full picture due to missing documents which could have been expected to exist and be produced.

23. I accept it is likely that:

   (1) Had the Company's accounts been produced, they could (and most likely would) have bolstered Dr Li's case that the alleged loan was not recorded; and

(2) All relevant documents been produced and the Court been presented with the full picture, they would have shown that the parties had decided not to go ahead with the loan arrangement which they had originally contemplated.

24. Mr Tang ultimately accepted that it is "overwhelmingly likely" that the alleged loan had not been disclosed in the Company's accounts, since: (i) directors' loans would have been recorded in the Company's accounts (and indeed, in the consolidated accounts of ListCo); (ii) directors' loans would be regarded as "low hanging fruit" in terms of recovery actions in 2000, since the relevant directors would have signed off on the accounts; and (iii) if the Liquidators wanted to chase down the directors' loan for repayment, it would be quite easy to do so in 2000 by checking it against the relevant subsidiaries' account.

25. Mr Tang accepted that he did, in his capacity as a liquidator of the Company, have a duty to act fairly in the presentation of the Company's case, yet it is obvious that he has failed to do so. In addition to the blatant breaches of his disclosure obligations highlighted above, I accept that it is clear that Mr Tang gave dishonest evidence to the Court under oath on numerous occasions.

26. I find that Mr Tang has lied on affirmation in respect of the following matters. **First**, Mr Tang affirmed in Tang 6th that the Company may have had in its custody possession and power its financial statements and management accounts in 1992 to 1999, but had "subsequently lost possession of the same, following the collapse and liquidation of the Siu Fung Group of Companies in 2000". He repeated this assertion in cross-

examination. This cannot be the case. Mr Tang simply could not have known whether, if the documents were once in the Company's power, possession or custody, they were subsequently lost, given that neither he nor his staff had ever gone through the 350 boxes of files. Also, it was impossible for him to believe that the accounts were lost "following the collapse and liquidation of the Siu Fung Group of Companies in 2000". There is simply no reason to believe that the KPMG liquidators (or Mr Tang himself) would have lost these accounts after they were appointed.

27. **Second**, Mr Tang gave evidence that he had read the accounts and general ledgers of the Listco, but not the Company, regarding his letter to Dr Li of 29 November 2000. It is highly improbable that Mr Tang would have studied the accounts and ledgers of the Listco (a holding company of the Group) and not the Company (a key operating subsidiary of the Group).

28. **Third**, when asked about whether he had gone through the 350 boxes of documents stored in the Godown (and the reason for not doing so), Mr Tang answered that he may have "misunderstood" his duties and cast the blame onto his legal team ("[t]o a large extent I have been relying on to seek my legal team and legal advice on these matters"). In my view this plainly a fabrication. It is inconceivable that a highly experienced liquidator like Mr Tang (and who all along had been legally advised) could have misunderstood the scope of the Liquidators' discovery obligations. He could not have honestly believed that as a litigant, all he had to disclose were documents which were referred to in his pleadings and witness statements. This is inconsistent with Mr Tang having prepared or seen

many lists of documents in cases, which would include documents not referred to in witness statements or pleadings.

29.     **Fourth**, when asked about the non-disclosure in the Prospectus of the alleged loan, Mr Tang suddenly made the assertion (for the first time in the entire proceedings) that the Company was not part of the Siu Fung Group as at the date of the Prospectus.  This is inconsistent with the Company's pleaded case: see *"[the Plaintiff] is a major operating subsidiary company within the Siu Fong Group of companies, led by the then listed Siu Fung Ceramics Holdings Limited"*[6]).

30.     This is also wholly unbelievable.  Mr Tang accepted that a list of previous names of the Company would have been obtained from a companies search, and would be an easily accessible document in his files.  I do not believe that Mr Tang was mistaken as to the name of the Company.  When pressed further as to why he had not made this point earlier, Mr Tang claimed that he was busy and had not read either the Company's or Dr Li's written opening submissions, or listened carefully to Dr Li's oral opening submissions (he was in Court) and so never realised that all parties were proceeding on the factual premise that the Company was part of the Siu Fung Group as at the listing of Listco in 1993.

31.     **Fifth**, when it was suggested to Mr Tang that he could not have been unaware of the fact that the Company was part of the Siu Fung Group given that its name, Siu Fung Strategy, was listed in the Prospectus as one of the Listco's subsidiaries, Mr Tang said that *"maybe what my staff produced to me was the 1992 return showing the names of the 3 individuals*

---

[6]   [1.5] Amended Statement of Claim.

*as we saw this morning*". This is not credible. It is highly unlikely that when Mr Tang instructed his staff to tell him whether the Company formed part of the Siu Fung Group in 1993, they would have brought him the Company's Annual Return for 1992 and that no one would appreciate the error.

32. On Mr Tang's own admission the Liquidators had also breached their discovery obligations in fundamental ways:

   (1)   As stated above, after being pressed in cross-examination, Mr Tang effectively had to accept that he had not disclosed relevant documents in the Company's possession, power and custody.

   (2)   In an attempt to explain himself, Mr Tang gave inconsistent and contradictory explanations as to his understanding of the scope of a liquidator's duties:-

      (a)   At first, Mr Tang accepted that the obligation pertains to the disclosure of all relevant documents.

      (b)   The next day, Mr Tang changed his position and claimed that he had misunderstood a liquidators' duties, which was to disclose merely documents that are expressly referred to in his witness statement and/or affirmations.

      (c)   After being pressed by Leading Counsel and the Court, as to the inconsistency between his evidence and the lists of documents the Company had filed, their scope clearly extending beyond what he had claimed, Mr Tang changed his evidence and claimed that he understood a liquidator's disclosure obligations to

extend also to known documents he knew existed which he could "name".

33. This is simply not credible. Mr Tang started in corporate insolvency work in KPMG in 1986. He became a partner and an appointment takers in KPMG since 1997. He said he had been involved in tens of High Court cases. He is a deeply experienced litigant. He has been represented by numerous solicitors. It is incredible that he would, in 2024, be so fundamentally mistaken in his understanding of discovery obligations.

34. Mr Tang's failure to act fairly is made more objectionable as the Company seeks to recover an alleged loan dating back more than 32 years ago and in respect of which the agreement was unsigned by Dr Li. This is plainly not a situation where one would expect the Defendant to recall the salient events or to be in possession of the relevant documents. Meanwhile the Liquidators had possession of 350 boxes of documents that they did not go through, and as we know from the uncovering of the bank statements, contained documents going back to 1992.

*Conclusion*

35. Mr Tang is no stranger to controversy. He has been the subject of a disqualification application made by the Official Receiver and also a finding of contempt for failing to comply with his discovery obligations. Although he was not disqualified his conduct has been subject to serious criticism by a number of judges. That he should be subject to yet another judgment in which the court has found he has fallen materially short of his duties to the Court demonstrates a belligerent indifference to

the standards required of him. His conduct in the present case is all the more objectionable because he has shown a shocking indifference to his affirmation to tell the truth. I have referred to the affirmation that he filed purporting to describe the disclosure undertaken by the Company. It was plainly a lie as I have no doubt was much of his evidence before me. It is totally unacceptable for an officer of the court to show such contempt for the integrity of the trial process.

36. I will refer this matter to the Official Receiver for her to consider commencing disqualification proceedings against Mr Tang, which should, if they are issued, be listed before me in the first instance. Until the Official Receiver has determined whether to make such an application, and if she does, it has been determined in my view it would be inappropriate for Mr Tang to be appointed as a liquidator or receiver by the Court.

37. I would also note this. Mr Tang was one of two Liquidators. As I note in **[1]** the other being Terry Kan. I appreciate that working with Mr Tang must be challenging; indeed I recall telling Mr Kan this in Court during a hearing of another matter. However, Mr Kan owed a duty to the Court to ensure the liquidation was conducted properly. If that meant having to challenge Mr Tang's conduct, it was his obligation to do so. Mr Kan's failure to protect the integrity of the insolvency process is made all the more objectionable by the fact that he was until recently the Chairman of the Hong Kong Institute of Certified Public Accountant's Restructuring and Insolvency Faculty. I will leave it to the Official Receiver to decide what, if any, action her Department wishes to take against Mr Kan, but I will send this judgment to the Institute with a view

to it taking disciplinary proceedings against Mr Kan, his conduct, albeit possibly mainly by omission, has brought the accountancy profession into serious disrepute.

(Jonathan Harris)
Judge of the Court of First Instance
High Court

Mr George Chu, instructed by Damien Shea & Co., for the Plaintiff

Mr Bernard Man SC and Mr Justin Ho, instructed by Anthony Siu & Co., for the Defendant