United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 10, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATED BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-33299** |
| **SIU-FUNG CERAMICS HOLDINGS** | § | |
| **LIMITED,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | **CHAPTER 15** |

## MEMORANDUM OPINION DENYING VERIFIED PETITION FOR RECOGNITION (RELATES TO ECF NOS. 1 & 2)

## BACKGROUND

I.    FACTUAL BACKGROUND.

A.    **The Siu-Fung Group Liquidation Proceedings and Siu-Fung Seigfried Lee's Personal Bankruptcy.**

Siu-Fung Ceramics Holdings Limited (hereinafter "SFCH") was incorporated in Bermuda on August 12, 1993, pursuant to the Laws of Bermuda in accordance with the provisions of the Companies Act, 1981 of Bermuda with the status as an exempted company.[1] On October 22, 1993, SFCH was registered in Hong Kong under Part XI of Chapter 32 of the Companies Ordinance of the Laws of Hong Kong (hereinafter "Chapter 32") and shortly thereafter established its principal place of business in Hong Kong.[2] Siu-Fung Ceramics Concept Company Limited (hereinafter "SFCCC") was incorporated in the British Virgin Islands (hereinafter the "BVI") on September 21, 1994 pursuant to the Laws of the BVI in accordance with the provisions of the International Business Companies Act (No. 8 of 1984) of the BVI.[3] The registered office of SFCCC is located at a post office box in the BVI, and its principal place

---

[1] ECF No. 2, Ex. B at 2.

[2] *Id.*

[3] *Id.* at 12.

1 / 66

of business is in Hong Kong.[4]   NHD Systems (Holdings) Limited (hereinafter "NHD Holdings") was incorporated in Hong Kong on July 30, 1992, pursuant to Chapter 32.[5]   NHD Holdings' registered office is located in Hong Kong.[6]   NHD Systems (Asia) Limited (hereinafter "NHD Asia") was incorporated on March 12, 1995, in Hong Kong pursuant to Chapter 32.[7]   NHD Asia's registered office is in Hong Kong.[8]   Siu-Fung Concept Limited (hereinafter "SFC") was incorporated in Hong Kong on May 20, 1983, pursuant to Chapter 32.[9]   SFC's registered office is in Hong Kong.[10]

SFCH, SFCCC, NHD Holdings, NHD Asia, and SFC (collectively, the "Siu-Fung Group" or "Siu-Fung Group Debtors" or the "Group") were part of a corporate empire spanning across Hong Kong and the People's Republic of China (hereinafter the "PRC") during the 1980s and 1990s. With SFCH as its top holding company, the Siu-Fung Group was a listed company on the Hong Kong Stock Exchange whose operations included running, through various subsidiary companies, a variety of joint ventures in Hong Kong and the PRC, the principal ventures of which revolved around the ceramic sanitary ware industry.[11]   Central to this Chapter 15 Petition for Recognition are investment interests SFC held in a major joint venture in Beijing known as Siu-Fung Ceramics (Beijing) Sanitary Ware Company Limited (hereinafter "BSW").[12]

In May and June of 2000, the Siu-Fung Group entities were placed into "winding-up" liquidation proceedings by the High Court of the Hong Kong Special Administrative Region Court of First Instance (hereinafter the "HK High Court").[13]   On June 14, 2000, the HK High

---

[4] *Id.*

[5] *Id.* at 19.

[6] *Id.*

[7] *Id.* at 27.

[8] *Id.*

[9] *Id.* at 34.

[10] *Id.*

[11] *Tang Trial Transcript*, ECF No. 76, at 16 ¶¶ 23–25, 17 ¶¶ 1–2.

[12] ECF No. 54-29, at 7 ¶ 4.1.

[13] ECF No. 2, Ex. B at 9–11, 16–18, 24–26, 31–33, 38.

Court appointed Messrs. Alan Chung Wah Tang (hereinafter "Mr. Tang") and Gabriel Chi Kok Tam (hereinafter "Mr. Tam") jointly and severally as provisional liquidators of SFCH.[14]   At the time of his appointment, Mr. Tang was a partner at KPMG and had extensive experience as a liquidator and trustee in Hong Kong insolvency proceedings.[15]   The Siu-Fung Group's liquidation proceedings remain active and pending since the original HK High Court Orders were issued in 2000.[16]

Siu-Fung Seigfried Lee (hereinafter "Mr. Lee") was a major shareholder, director, and chairman of the Siu-Fung Group.[17]   In 1995 and 1996, because of serious financial difficulties the Siu-Fung Group was experiencing at the time, Mr. Lee provided personal guarantees to secure financing for the Group from a number of Hong Kong lending institutions, including Hongkong and Shanghai Banking Corporation, Limited (hereinafter "HSBC"), and DBS Bank (Hong Kong) Limited.[18]   Despite Mr. Lee's efforts, the Group continued to experience a deteriorating financial position.[19]   In 1997, HSBC demanded Mr. Lee repay HK$177.63 million due under various term loan facilities, and on January 18, 2001, filed a "bankruptcy petition for indebtedness in the aggregate sum of HK$322 million" against Mr. Lee.[20]   On May 8, 2001, Mr. Lee was adjudged bankrupt per a HK High Court Order (hereinafter the "Lee 2001 Bankruptcy").[21]   On September 19, 2002, at a general meeting of creditors, Mr. Tang and Alison Wong Lee Fung Ying (hereinafter "Ms. Wong") were appointed as joint and several trustees for the Lee 2001 Bankruptcy.[22]   Mr. Tang has remained the trustee of the Lee 2001 Bankruptcy since his appointment in 2002, and currently

---

[14] ECF No. 52-7, at 2.
[15] ECF No. 75, at 28 ¶¶ 23–25, 29 ¶¶1–19, 32 ¶¶ 5–8.
[16] ECF No. 80-5, at 61 ¶ 86.
[17] ECF No. 53-3, at 6 ¶ 7.
[18] *Id.* at 8 ¶¶ 13–14.
[19] *Id.*
[20] *Id.* at 5 ¶ 2.
[21] ECF No. 54-1, at 3 ¶ 7.
[22] ECF No. 52-13, at 1.

acts in that role alongside his co-trustee Anita Hou Chung Man (hereinafter "Ms. Hou"), who replaced Ms. Wong on April 9, 2015.[23]

In 2001, Mr. Tang left KPMG and temporarily ceased being a liquidator for the Siu-Fung Group.[24]   Mr. Lee received a personal discharge in the Lee 2001 Bankruptcy as of May 8, 2005.[25]   Under Hong Kong Law, despite Mr. Lee's personal discharge, Mr. Tang remained in his position as trustee and continued with his statutory duty of collecting, realizing, and distributing the assets of the bankrupt that fell within the estate.[26]   In connection with his duties as trustee, Mr. Tang continued to investigate Mr. Lee and his family members and their involvement with allegedly fraudulent transfers of assets of the Siu-Fung Group prior to and during the Siu-Fung Group liquidation proceedings.[27]   According to Mr. Tang, despite Mr. Lee having received a personal discharge, these continued investigations were necessary because (i) Mr. Lee and his family members have been uncooperative with discovery orders issued in the Lee 2001 Bankruptcy and ongoing Siu-Fung Group liquidation proceedings, and (ii) investigating possible fraudulent transfers may provide the basis for additional claims against Mr. Lee in the Lee 2001 Bankruptcy under Hong Kong law.[28]   Mr. Tang has issued multiple reports in the Lee 2001 Bankruptcy relating to these investigations over the last 24 years and has engaged in more substantive investigations of Mr. Lee and his family members since 2016 following Mr. Tang's reappointment as joint liquidator for the Siu-Fung Group.[29]   Upon Mr. Tang's reappointment in May and June of 2016, Terry Lap Kee Kan (hereinafter "Mr. Kan") replaced Mr. Tam as joint liquidator alongside Mr. Tang.[30]   Mr. Tang, Mr. Kan, and Ms. Hou (collectively the "Foreign Representatives" or "FRs") have remained as

---

[23] ECF No. 52-14, at 1.
[24] ECF No. 75, at 29 ¶¶ 5–11.
[25] ECF No. 55-1, at 1.
[26] ECF No. 80-5, at 40 ¶ 52.
[27] *Tang Trial Transcript*, ECF No. 75, at 77 ¶¶ 5–9.
[28] ECF No. 52-29, at 10 ¶ 7.5.
[29] *See generally* ECF Nos. 53-3–5, 54-1–29, 56-1–3.
[30] ECF No. 52-8, at 1–2 ¶ 2.

joint and several liquidators and/or trustees of the Siu-Fung Group and the Lee 2001 Bankruptcy, respectively, until the present.

### B. The BSW Sale and Alleged Fraudulent Transfer of Mr. Lee's Assets to the United States.

Below is a summarization of the last 24 years of the FRs' investigation into Mr. Lee and his family members in connection with the Lee 2001 Bankruptcy. For reasons discussed below, the Court has potential reservations as to the credibility of both Mr. Tang and Mr. Lee's testimony and their respective characterizations of the events that have occurred over the last 24 years with respect to the Siu-Fung Group liquidation proceedings, the Lee 2001 Bankruptcy, and the alleged fraudulent transfer of Mr. Lee's assets to the United States. The merits of any fraudulent transfer claim the FRs may have against Mr. Lee in connection with the Lee 2001 Bankruptcy is not before the Court today. This Court's summarization laid out *infra* is meant to provide context for this Chapter 15 Petition for Recognition, and to help determine whether the FRs satisfied the requirements of sections 1517 and 109(a) of the Bankruptcy Code.

According to the FRs, the Siu-Fung Group was restructured in 1994, whereby a 20% interest the Group held in BSW was placed into a wholly owned subsidiary Kingbridge Investments Limited (hereinafter "Kingbridge"), a BVI company incorporated in 1994.[31] Accordingly, after the restructuring, SFCH held a 36% interest in BSW; Kingbridge held a 20% interest; Hillmond International Holdings Limited (hereinafter "Hillmond") held 22%; and a mainland PRC entity Beijing Glass No. 2 Factory (hereinafter "Beijing Glass Corp") held 22%.[32] According to the FRs, on May 15, 1999, Kingbridge was transferred to World Cheer Enterprises Limited (hereinafter "World Cheer"), a Hong Kong company incorporated in 1999, for "nil" consideration.[33] According to the FRs, under Hong Kong law this transfer fell within the "voidable claw-back"

---

[31] ECF No. 54-29, at 8 ¶ 4.2.
[32] *Id.* at 16 ¶ 10.6; ECF No. 60-9, at 11.
[33] ECF No. 54-29, at 4 ¶ 4.3

period of five years from the Siu-Fung Group liquidation in 2000, as a "transaction at an undervalue."[34]

On July 12, 2001, as part of the liquidation of the Siu-Fung Group, Mr. Tang, as then-acting joint liquidator of SFCH approved a sale of portions of the Siu-Fung Group through a HK High Court facilitated process.[35] Because the Siu-Fung Group was—at the time—a listed company on the Hong Kong Stock Exchange, the local Listing Rules for the Exchange required a press announcement of the sale (hereinafter the "2001 Announcements"), which occurred on August 13 and 14 of 2001.[36] Per the 2001 Announcements, an agreement was entered into for the sale of the 36% interest in BSW (hereinafter the "BSW Sale") from the Siu-Fung Group to Kingbridge, then a wholly owned subsidiary of World Cheer, for HK$17 million.[37]

Also as part of the transaction, a 70% interest in Dubois Beijing, another Siu-Fung-owned joint venture, was sold to Asset Reward—a wholly owned subsidiary of Lion Legend Holdings Limited (hereinafter "Lion Legend"), which is a Cayman company owned up to 68% by Capital Ocean Enterprises Limited (hereinafter "Capital Ocean") and up to 32% by World Cheer—for consideration of HK$2 million.[38] At the time of the BSW Sale, the 2001 Announcements stated that World Cheer was beneficially owned by Wong Ying, Yip Siu Yin and Fu De Liang.[39] The 2001 Announcements also described Capital Ocean as a BVI company wholly-beneficially owned by Mr. Lee's brother, Dr. Li Xiao Yi, Benjamin (hereinafter "Mr. Benjamin Li").[40] The 2001 Announcements stated the three beneficial owners of World Cheer were independent and not connected with the liquidators of the Siu-Fung Group, Mr. Lee, Mr. Benjamin Li, nor the substantial shareholders of the Siu-Fung Group

---

[34] *Id.*

[35] *Id.* at 4–5, ¶ 5.1.

[36] ECF No. 60-9; ECF No. 125-1.

[37] ECF No. 60-9, at 2; ECF No. 125-1, at 2.

[38] *See supra* note 37.

[39] ECF No. 60-9, at 7; ECF No. 125-1, at 7.

[40] ECF No. 60-9, at 6–7; ECF No. 125-1, at 7.

and their respective associates as defined under the Hong Kong Stock Exchange Listing Rules.[41]

As part of the BSW Sale, the 2001 Announcements stated Lion Legend would appoint Mr. Lee as a consultant to "the acquired business," and Mr. Benjamin Li as chairman to the "acquired business."[42]  According to Mr. Tang's testimony at trial and the 2001 Announcements, the plan after the BSW Sale was for Mr. Benjamin Li to continue to restructure the Siu-Fung Group in order to re-list it quickly, which was a common practice during the Asian Financial Crisis.[43]

According to the FRs, on March 20, 2003, World Cheer transferred 100% of Kingbridge to Lion Legend.  In 2005, Mr. Benjamin Li would allegedly transfer ownership of Lion Legend to Mr. Lee's son Lelalertsuphakun Surasak (hereinafter "Surasak"), (although theories as to how these alleged transfers may have occurred remain obscure to both the FRs and this Court).[44]

---

[41] ECF No. 60-9, at 7; ECF No. 125-1, at 7.

[42] ECF No. 60-9, at 9; ECF No. 125-1, at 9.  The Court understands the term "acquired business" to refer to both portions of Dubois Beijing and BSW sold to Lion Legend and World Cheer, respectively.  *Id.*

[43] ECF No. 60-9, at 9; ECF No. 125-1, at 9; *Tang Trial Testimony*, ECF No. 75, at 43 ¶¶ 16–25.  In addition to the primary sale of BSW to Mr. Li, Mr. Tang allegedly orchestrated sales of one or two others joint ventures in various parts of China before leaving his position as joint liquidator for the Group.  *Tang Trial Testimony*, ECF No. 75, at 44 ¶ 11–14; *Tang Trial Testimony*, ECF No. 156, at 108 ¶¶ 7–8.  Despite the consummation of the sale and approval by Mr. Tang, the Parties at trial raised allegations that a Shenzhen Court in the PRC issued an order freezing the 36% interest in BSW, which was unfrozen only after Mr. Lee and his brother paid either one or two HK$100,000 "charges" to that court.  *Tang Trial Testimony*, ECF No. 156, at 105 ¶¶ 23–25, 106 ¶¶ 1–9; *Lee Trial Testimony*, ECF No. 117, at 43 ¶¶ 10–12, 44 ¶¶ 15, 17, 19, 45 ¶¶ 6–7  Mr. Tang characterizes these charge payments as further indicia that the 36% sale was fraudulent, however the Court fails to see the connection between a charge the Lee/Li brothers paid to a Shenzhen Court and allegations that the consideration Mr. Benjamin Li provided for the 36% of shares actually came from Mr. Lee.  Moreover, the merits of any fraud case Mr. Tang might ultimately bring against Mr. Lee are not before this Court.

[44] ECF No. 66-31.

According to the FRs, on May 28, 2012, China Eco-Farming Limited, a company previously listed on the Growth Enterprise Market board of the Hong Kong Stock Exchange, made an announcement that it had acquired from Lion Legend a 10% interest in Kingbridge.[45] Allegedly, the announcement listed major shareholders of Lion Legend as, *inter alia*, Goldsmith International Limited (hereinafter "Goldsmith"), a BVI company incorporated in 1998, Capital Ocean and Shine Eagle Holdings Limited.[46] Allegedly, these shareholder companies were all wholly owned by Surasak at the time, who also acted as their sole director.[47] Surasak was also the alleged sole director of Lion Legend at the time.[48]

On March 26, 2015, Roy Ceramics SE (later changed to Roy Asset Holding in 2019) (hereinafter the "Roy Group"), was listed on the Frankfurt stock exchange.[49] According to the FRs, the Roy Group's 2014 Annual Report listed BSW as an asset, showing a value of €203 million.[50] According to the FRs, in exchange for Surasak's contribution of BSW and other assets from the Siu-Fung Group, the Roy Group issued shares to Shine Eagle Trust Reg (hereinafter "Shine Eagle"), totaling 65% of the Roy Group's outstanding shares.[51] According to the FRs, 100% of Shine Eagle was owned in varying amounts by Surasak, Mr. Lee's daughter Lelalertsuphakun Sujida Lee (hereinafter "Sujida"), and Mr. Lee's wife Yang Lei.[52] The Roy Group listing prospectus, issued in March of 2015, apparently listed Lion Legend as a wholly owned subsidiary, having been indirectly owned by Surasak through Capital Ocean and Siu-Fung Concept Limited (hereinafter "SFC-BVI") since 2001.[53] SFC-BVI is allegedly a BVI company incorporated in October of

---

[45] ECF No. 101, at 20–21 ¶ 43(5).
[46] *Id.*
[47] *Id.*
[48] ECF No. 54-29, at 19 ¶ 10.2.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.* at ¶ 10.3.
[53] ECF No. 101, at 22 ¶ 43(6).

2000, which bore a similar name to the aforementioned SFC—a Hong Kong company incorporated in 1983 that exists within the liquidating Siu-Fung Group.[54] The FRs believe this confusing similarity in names was meant to obfuscate the true ownership of the BSW assets, attempting to fabricate the image that through SFC-BVI, Lion Legend had legitimate ownership of the BSW assets since 2001.[55] According to the FRs, from 2015 until 2024, various members of the Lee family, including Mr. Lee, Surasak, Sujida, and Yang Lei sat in a number of different key management and C-Suite executive positions for companies within the Roy Group, including Lion Legend.[56]

On August 26, 2014, Mr. Lee also incorporated Roy USA, Inc. (hereinafter "Roy USA") in California, which at the time was a wholly owned subsidiary of SFC-BVI.[57]

According to the FRs, in September of 2015, after the listing of the Roy Group on the Frankfurt Stock Exchange, Mr. Lee orchestrated a sale of Lion Legend's 100% ownership interest in Kingbridge and Hillmond, both of which then purportedly housed the BSW assets, to White Horse Holdings Limited (hereinafter "White Horse") for $80 million (hereinafter the "PRC Sale").[58]

In light of the information contained in the Roy Group prospectus listing from 2015, the FRs speculated as to what truly occurred during the 2001 BSW Sale and the subsequent history of transfers of BSW to the Roy Group through Lion Legend. The FRs brought their speculations and suspicions to the HK High Court in the Lee 2001 Bankruptcy, and on September 28, 2016, and September 21, 2017,

---

[54] ECF No. 54-29, at 21 ¶ 10.7.

[55] *Id.*

[56] *Id.* at 19–21, ¶¶ 10.4, 10.5.

[57] ECF No. 66-1, at 2; ECF 60-24 at 2.

[58] ECF No. 56-11, at 68; ECF No. 21 at ¶ 10.9; ECF No. 151, at 23. At the time of the PRC Sale, Kingbridge allegedly owned 67.11% of BSW, Hillmond owned 10.89%, and Beijing Glass Corp still owned the 22% it had apparently retained since prior to 1995. It remains to be seen both by the FRs and this Court how Lion Legend acquired ownership of Hillmond and how Kingbridge acquired a 67.11% stake in BSW.

Justice Godfrey Lam of the HK High Court issued discovery and examination orders under Section 29 of the Bankruptcy Ordinance (Chapter 6) (hereinafter the "Lam S29 Orders") against Mr. Lee, Mr. Benjamin Li, Surasak, and Mr. Lee's two sisters.[59]

In rendering his decision to enter the S29 Orders, Justice Lam acknowledged a 2004 report from the Hong Kong Insider Dealing Tribunal, which found Mr. Lee had engaged in approximately HK$25 million in insider dealing transactions, as well as having "feathered a nest offshore to avoid his creditors in Hong Kong" through use of his family members, subordinates, and their family members.[60] Moreover, Justice Lam also contemplated "suspicion" that arose as to the original BSW Sale and transfer of BSW to the Roy Group in light of information adduced from the Roy Group listing in 2015.[61]

These subsequent 2016 and 2017 examinations in connection with the Lam S29 Orders allegedly revealed to Mr. Tang that Mr. Benjamin Li paid "very little, if not nothing" for the 36% BSW interest and 70% Dubois Beijing interest acquired during the BSW Sale.[62] Moreover, after reviewing KPMG records kept in connection with the Siu-Fung Group liquidation since 2001, the FRs allegedly discovered that the source of funding for the BSW Sale came from Goldsmith.[63] According to the FRs, during the relevant period of time between July 12, 2001, and August 8, 2003, in which Goldsmith was making payments in accordance with the BSW Sale, the company was managed by Wong Ying (a major shareholders of World Cheer at the time of the BSW Sale) and He Feng, both of whom were former employees of the Siu-Fung Group and "close personal lieutenants of [Mr.] Lee."[64] As above, Mr. Benjamin Li would then allegedly transfer Lion Legend and the BSW assets to Surasak, who would contribute them to the Roy Group.

---

[59] ECF No. 54-6 at 2, 63.
[60] *Id.* at 4–5 ¶ 6.
[61] *Id.* at 27 ¶ 59.
[62] ECF No. 54-29, at 9 ¶ 5.3.
[63] *Id.* at 9–11 ¶¶ 5.5, 5.7.
[64] *Id.*

According to the FRs, therefore, the pre-bankruptcy transfer of BSW to Kingbridge and subsequent transfer to World Cheer, the BSW Sale, subsequent transfers over the next decade, and eventual PRC Sale to White Horse enabled Mr. Lee to maintain ownership of his assets, circumventing the Siu-Fung Group liquidation and Lee 2001 bankruptcy by using Mr. Benjamin Li, Wong Ying, He Feng, Surasak, and other Lee family members as strawmen for transactions orchestrated by Mr. Lee himself.[65]

In August of 2016, Mr. Lee left Hong Kong and moved to California on an F2 visa he obtained in connection with his employment at Roy USA.[66]  After arriving in the United States, Mr. Lee allegedly transferred the proceeds of the PRC Sale to the Roy Group, which in turn transferred $60 million of those proceeds to Roy USA.[67]  The corporate structure of the Roy Group would subsequently evolve.  As of 2020, the Roy Group owned 100% of Lion Legend, which in turn owned Roy USA, along with a number of California and Texas-based Roy Group subsidiaries operating as real estate investment vehicles.[68]  After the $60 million transfer to Roy USA, Mr. Lee would allegedly use $34

---

[65] According to the FRs, Mr. Lee also allegedly orchestrated fraudulent sales of other Siu-Fung Group joint ventures to non-debtor third parties and insiders between the years 1995 to 1999 for cash totaling approximately HK$210 million in the lead-up to the Group's liquidation in 2000.  *Id.* at 18 ¶ 9.1.  According to the FRs, the cash proceeds for the sale of these joint ventures were not reported as part of the Lee 2001 Bankruptcy, effectively defrauding creditors in both the yet-to-be-filed Siu-Fung Group liquidation, as well as Mr. Lee's yet-to-be-filed personal bankruptcy.  *Id.*  The FRs believes portions of those sale proceeds were used to fund the consideration for the BSW Sale purportedly provided by Mr. Benjamin Li.  ECF No. 66-31.  On October 25, 2017, Mr. Tang filed a claim in the Lee 2001 Bankruptcy for recovery of these unreported "after-acquired" assets, along with an accounting for a substantial portion of the alleged sales that did not contain corresponding receipts.  ECF No. 54-4.  These claims remain pending as of today.

[66] ECF No. 59-1; *see also* ECF No. 59-2.  There is substantial dispute between the Parties as to whether Mr. Lee moved to California in response to the Lam S29 Orders which required him to respond to examinations in front of a HK High Court Master in connection with the Lee 2001 Bankruptcy.

[67] ECF No. 99-2, at 68 ¶¶ 5–10; ECF No. 151 at 24.

[68] ECF No. 60-28.

million of those proceeds to fund his real estate projects in Houston, Texas.[69]

Also in 2016, according to the FRs, Mr. Lee orchestrated the transfer of a majority ownership interest in Roy Group shares from Shine Eagle to Hi Scene Industrial, Limited (hereinafter "HSI") a BVI company incorporated in 1999, allegedly owned and directed by Sujida as of 2016.[70]  In March 2017, Mr. Lee began leasing and living in a home in Pasadena, California.  In August of 2022, this home was allegedly titled to Hi Scene Industrial, Inc. (hereinafter "Hi Scene") (a California company incorporated on June 30, 2022), for no consideration.[71]  Sujida is allegedly the owner, director, and CEO of Hi Scene as well.[72]

Despite moving to the United States in 2016, the FRs continued with their examination attempts and discovery requests against Mr. Lee and his family members in connection with the Lee 2001 Bankruptcy for the next nine years, until present day.[73]  According to the FRs, Mr. Lee and his family members remained evasive and un-cooperative as to the FRs examinations, often failing to appear, and generally failing or refusing to hand over documents in connection with discovery requests.[74]  The HK High Court issued various orders for costs against Mr. Lee for his failing to appear and for the FRs' efforts in filing notices in the Lee 2001 Bankruptcy.[75]  On June 9, 2020, the HK High Court ordered Mr. Lee to pay the FRs costs totaling approximately HK $128,000 based on Mr. Lee's non-cooperation.[76]  On December 18, 2020, the HK High Court issued an Allocatur Order against Mr. Lee for approximately HK$5.6 million in fees the FRs had accumulated in

---

[69] ECF No. 99-2, at 62 ¶¶ 4–24.
[70] ECF No. 54-29, at 22 ¶ 10.12.
[71] *Id.* at 23 ¶ 11.2.
[72] *Id.*
[73] *Id.* at 13–14 ¶¶ 7.3, 7.4; *see also* ECF No. 56-3.
[74] ECF No. 54-29, at 14 ¶ 7.5.
[75] ECF No. 54-8, 54-9, 54-10.
[76] ECF 54-19, at 2.

connection with pursuing the Lam S29 Orders over the preceding three to four years.[77]

On January 11, 2023, Mr. Tang and Ms. Hou filed a complaint (hereinafter the "California Lawsuit") in the Superior Court of California, County of Los Angeles Civil Division (hereinafter the "California Court") seeking to domesticate foreign judgments against Mr. Lee based on the HK High Court orders for costs and the Allocatur Order.[78]  On March 28, 2023, Mr. Tang and Ms. Hou filed a second involuntary bankruptcy petition (hereinafter the "Lee 2023 Bankruptcy") against Mr. Lee in the HK High Court based on Mr. Lee's failure to pay these court orders for costs and the Allocatur Order.[79]  Mr. Tang and Ms. Hou were acting as creditors in connection with the Lee 2023 Bankruptcy, despite continuing to act as trustees in the Lee 2001 Bankruptcy.[80]

In June of 2023, Jiao Wen (hereinafter "Ms. Wen"), a former ex-girlfriend of Mr. Lee with whom he allegedly shares multiple children, approached Mr. Tang in Houston claiming to have information as to Mr. Lee's corporate activities with respect to the Roy Group and Lion Legend.[81]  Sometime during their meetings in 2023 and subsequent communications, Mr. Tang allegedly offered Ms. Wen 33% of the assets he might recover from Mr. Lee in the Lee 2001 Bankruptcy in exchange for providing information and documents related to Mr. Lee, the Roy Group, and Lion Legend.[82]

On October 17, 2024, Judge Jonathan Harris of the HK High Court dismissed an action Mr. Tang filed against Mr. Benjamin Li,

---

[77] ECF 54-23.

[78] ECF 68-12.

[79] ECF 68-3.

[80] *Id.*

[81] ECF No. 54-29, at 28 ¶ 14.1, 30 ¶ 14.5.

[82] *Wen Trial Testimony*, ECF No. 154 at 191 ¶¶ 2–5.  Mr. Tang, however, testified he did not offer Ms. Wen any financial support in connection with her participation in this case.  *Tang Trial Testimony*, ECF No. 154 at 5 ¶ 22.  No written evidence of any such offers to Ms. Wen were admitted into evidence.  Rather, Ms. Wen's testimony goes to Mr. Tang's credibility and the weight of his testimony.

which claimed he owed the Siu-Fung Group $1 million plus interest based on an allegedly 25 year old loan agreement.[83]  On January 21, 2025, Judge Harris issued an opinion as to why the HK High Court dismissed Mr. Tang's claim, finding *inter alia* (i) Mr. Tang had failed to comply with his discovery obligations in connection with litigating his claim, (ii) Mr. Tang had made the "commercial decision" to neglect a substantive review of 350 boxes of  files of KMPG records retained from 2001 to 2016 during his absence as joint liquidator because he lacked the funding to do so, and (iii) based on Mr. Tang's failure to review the 350 boxes of files at his disposal, Mr. Tang had lied to the court when he submitted an affirmation stating "[the Siu-Fung Group may have had custody of documents relating to its financial statement and management accounts from 1992 to 1999, which were subsequently lost following the Group's liquidation in 2000]."[84]  Mr. Tang appealed the Judge Harris decision, and that appeal is pending.[85]

On January 28, 2025, Judge Phoebe Man of the HK High Court issued an order compelling Sujida to provide the FRs with discovery and submit to an examination in connection with the Lee 2001 Bankruptcy.[86] Judge Man's order incorporated the factual record laid out by Justice Lam in his 2016 decision regarding the potentially suspicious nature of the BSW Sale and corporate history of the Roy Group, and reiterates the HK High Court's suspicions regarding Mr. Lee's corporate activities over the last thirty years.[87]  Given Sujida was not named in the Lam S29 Orders, this apparently provided a justification for Mr. Lee to place greater reliance on her in connection with his alleged machinations—as evidenced by her subsequent ownership and management of the Roy Group, HSI, and Hi Scene—which Judge Man believed necessitated a further examination of Sujida.[88]  On May 15, 2025, Sujida responded to the Judge Man's discovery order, detailing her knowledge of and

---

[83] ECF 55-11.
[84] *Id.*
[85] ECF No. 86.
[86] ECF No. 56-3.
[87] *Id.*
[88] *Id.*

involvement with BSW, Goldsmith, HSI, Hi Scene, Lion Legend, the Roy Group, and Shine Eagle, as well as Mr. Lee's corporate activities over the last thirty years.[89]

## II.   Procedural Background.

On July 19, 2024, the FRs filed the above captioned Chapter 15 Petition for Recognition of Foreign Proceeding (hereinafter the "Petition for Recognition").[90]   On the same day, the FRs filed the Verified Petition Pursuant to 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1519, 1521, and 1525 for Entry of an Order Recognizing Foreign Proceedings and Granting Provisional Relief (Discovery) (hereinafter the "Verified Petition"), seeking recognition of the Siu-Fung Group liquidation proceedings, the Lee 2001 Bankruptcy, and the Lee 2023 Bankruptcy.[91]

On September 19, 2024, Mr. Lee filed the Motion to Dismiss under Rule 12(b) and Response to Notice of Hearing, or in the Alternative, Motion to Stay Pending Plaintiff's California Lawsuit (hereinafter the "Motion to Dismiss").[92]   On January 15, 2025, Mr. Lee filed a Motion to Amend his Motion to Dismiss.[93]   On January 27, 2025 the Court entered the Order Granting Leave to File Amended Motion to Dismiss.[94]   The same day, Mr. Lee filed the Amended Motion to Dismiss for Other Causes (hereinafter the "Amended Motion to Dismiss").[95]   On February 2, 2025, the California Court granted a motion for summary judgment Mr. Tang and Ms. Hou had filed in the California Lawsuit, thereby domesticating as foreign judgments the HK High Court orders for cost and Allocatur Orders against Mr. Lee.[96]   Accordingly, Mr. Lee's Motion to Stay Pending Plaintiff's California Lawsuit has been mooted.

---

[89] ECF No. 118-2.
[90] ECF No. 1.
[91] ECF No. 2.
[92] ECF No. 18.
[93] ECF No. 36.
[94] ECF No. 40.
[95] ECF No. 41.
[96] ECF No. 68-12.

On November 7, 2024, the FRs filed the Motion to Compel Production of Documents and Information from Ms. Wen (hereinafter the "Motion to Compel").[97]

On February 10, 2025, a ten-day long trial commenced, spanning across seven and a half months, during which approximately 350 exhibits were admitted, and extensive testimony was adduced from Messrs. Tang and Lee.[98]   Expert testimony as to Hong Kong law was also adduced from the FRs' expert witness Kingsley Ong (hereinafter "Mr. Ong") and Mr. Lee's expert witness Alex Cheng (hereinafter "Mr. Cheng").[99]   Testimony was also adduced from Ms. Wen.[100]

On April 9, 2025, Mr. Tang arranged a wire transfer of $1,200 to his attorneys at Archer & Greiner, PC, (hereinafter "Archer") to be held as a security retainer on behalf of the Siu-Fung Group (hereinafter the "Archer Retainer").[101]   The Archer Retainer was thereafter deposited into Archer's IOLTA escrow account with Chase Bank in Houston, Texas.[102]   On April 16, 2026, the FRs filed an Amendment to the Verified Petition (hereinafter the "Amended Verified Petition"), amending the Verified Petition to reflect their argument that the Archer Retainer transferred in early April satisfied section 109(a) of the Bankruptcy Code.[103]   On April 23, 2025, the FRs filed the Motion for Leave to File Motion for Partial Summary Judgment as to the 11 U.S.C. § 109 Jurisdictional Issue Raised by the Court as to the Corporate Debtors' Chapter 15 Petition Based Upon Amendment to the Petition and Request for Continuance of Debtor Lee's Trial Testimony Until the 11 U.S.C. § 109 Jurisdictional Issue Has Been Adjudicated (hereinafter the "Motion for Leave").[104]   On May 19, 2025, the Court entered an Order on Scheduling of the Motion to File Partial Summary Judgment, stating it

---

[97] ECF No. 25.
[98] ECF No. 63; ECF No. 64.
[99] ECF No. 139; ECF No. 144.
[100] ECF No. 88.
[101] ECF No. 97-1, at 3 ¶ 5.
[102] *Id.* at ¶ 6.
[103] *See generally id.*
[104] ECF No. 98.

will consider the Motion for Leave and substantive issues surrounding the applicability of Bankruptcy Code section 109(a) to Chapter 15 at the conclusion of the Hearing on recognition along with all matters.[105]

On September 30, 2025, over a year after the original Verified Petition was filed, the Parties presented closing arguments.[106]  At the conclusion of the hearing the Court took the Amended Verified Petition and related Amended Motion to Dismiss and Motion for Leave under advisement.[107]

## JURISDICTION

28 U.S.C. § 1334 provides the District Courts with jurisdiction over this proceeding.  28 U.S.C. § 157(b)(1) states "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title."  This Court has jurisdiction over this proceeding as it is a core proceeding the Court can consider under 28 U.S.C. § 157(b)(2)(P).  This proceeding has been referred to the Bankruptcy Court under General Order 2012-6.  The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).  Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## LEGAL STANDARD

### I.    Chapter 15 Statutory Provisions.

Congress enacted Chapter 15 of the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Pub.L. No. 109–8, 119 Stat. 23 [hereinafter "BAPCPA"].  The stated purpose of Chapter 15 "is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases

---

[105] ECF No. 115.
[106] ECF No. 168.
[107] *Id.*

of cross-border insolvency."[108]   11 U.S.C. § 1501(a).   The express objective of Chapter 15 is to promote

> (1) cooperation between—
>> (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
>> (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> (2) greater legal certainty for trade and investment;
> (3) fair and efficient administration of cross-border insolvencies that protect the interests of all creditors, and other interested entities, including the debtor;
> (4) protection and maximization of the value of the debtor's assets; and
> (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a)(1)–(5).

Generally, getting "recognition" of the foreign proceeding under sections 1515 and 1517(a) of the Bankruptcy Code is the first step in obtaining relief under Chapter 15. *SPhinX-Bankruptcy*, 351 B.R. at 115. "Recognition" under section 1502(7) "means entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter." 11 U.S.C. § 1502(7). Pursuant to section 1509, "[a] foreign representative may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515." 11 U.S.C. § 1509.

---

[108] The "Model Law" within the meaning of 11 U.S.C. § 1501 is a "reference to the Model Law promulgated by the United Nations Commission on International Trade Law [(hereinafter "UNCITRAL")] at its Thirtieth Session on May 12–30, 1997, UN Sales No. E.99V.3. *See In re SPhinX, Ltd*, 351 B.R. 103, 112, n. 11 (Bankr. S.D.N.Y. 2006) (hereinafter "*SPhinX-Bankruptcy*"); *see also* H.R. Rep. 109–31, pt. 1, 109th Cong., 1st Sess., U.S. Code Cong. & Admin. News 2005, pp.88, 105–107 (2005) [hereinafter the "House Report"].

A petition for recognition filed by a foreign representative, properly filed under section 1515 and submitted with certain requisite evidentiary documents, is evaluated under section 1517. *In re Geden Holdings, Ltd.*, No. 25-90138, 2025 WL 2484883 at *2 (Bankr. S.D. Tex. August 28, 2025); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (In re Provisional Liquidation)*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) [hereinafter "*Bear Stearns-Bankruptcy*"].   Section 1517 provides, in relevant part

> (a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
>> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>> (2) the foreign representative applying for recognition is a person or body; and
>> (3) the petition meets the requirements of section 1515.
> (b) Such foreign proceeding shall be recognized—
>> (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
>> (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

11 U.S.C. § 1517(a)–(b).

Recognition under section 1517 is subject to the public policy exception under Bankruptcy Code section 1506, which states "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Section 1506 has been "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental

policies of the United States.'"  House Report at 172; *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010) [hereinafter "*Ran-Circuit*"].

The word "shall" in section 1517(a) makes recognition mandatory in instances where the requirements of section 1517 have been satisfied and there is no public policy basis under section 1506 to deny it.  *In re Black Gold S.A.R.L.*, 635 B.R. 517, 526 (9th Cir. BAP 2022); *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 306–309 (3rd Cir. 2013); *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 870 (Bankr. S.D.N.Y. 2021); *In re Creative Fin. Ltd.*, 543 B.R. 498, 514 (Bankr. S.D.N.Y. 2016); *In re Millard*, 501 B.R. 644, 653–54 (Bankr. S.D.N.Y. 2013).  The foreign representative bears the burden of proof for the requirements of section 1517.  *See Ran-Circuit*, 607 F.3d at 1021 (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 334 (S.D.N.Y. 2008) [hereinafter "*Bear Stearns-District*"].

### A.    Foreign Main Proceeding.

Under section 1502(4), a "'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interest," also referred to as the debtor's "COMI."  11 U.S.C. § 1502(4).  *Ran-Circuit*, 607 F.3d at 1022 (denying foreign main recognition because debtor's COMI was not in jurisdiction where foreign proceeding was taking place); *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 781 (Bankr. S.D.N.Y. 2022) (recognizing foreign main proceeding); *In re Ocean Rig UDW, Inc.*, 570 B.R. 687, 702 (Bankr. S.D.N.Y. 2017) (recognizing foreign main proceeding); *see also Morning Mist Holdings, Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 138 (2d Cir. 2013) [hereinafter "*Fairfield Sentry-Circuit*"] (discussing the origin of COMI).  While COMI is not necessarily defined under the Bankruptcy Code, section 1516(c) establishes that the "debtor's registered office, or habitual residence in the case of an individual, is presumed to be the [debtor's COMI]."  11 U.S.C. § 1516(c).

The statutory presumption under section 1516(c) is rebuttable in the presence of evidence to the contrary.  *Id.*; *Bear Stearns-District*, 389 B.R. at 336 (noting the COMI presumption may be overcome,

particularly in the case of a "letterbox company"); *see also SPhinX-Bankruptcy*, 351 B.R. at 118 (interpreting COMI in context of its international origin).   Factors courts consider in determining whether the COMI presumption has been overcome include

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of a majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*SPhinX-Bankruptcy*, 351 B.R. at 117.

> Factors that are useful in instances where the debtor is an individual include: the location of the debtor's primary assets; the location of a majority of the debtor's creditors or a majority of creditors [who] would be affected by the case; and the jurisdiction whose law would apply to most disputes.

*In re Loy*, 380 B.R. 154, 162 (Bankr. E.D. Va. 2007).   As explained by the *SPhinX-Bankruptcy* court, "the flexibility inherent in Chapter 15 strongly suggests" courts should not apply these factors "mechanically," but rather should view them "in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value."   *SPhinX-Bankruptcy*, 351 B.R. at 117.

The Fifth Circuit found it "important that the debtor's COMI be ascertainable by third parties."[109]   *Ran-Circuit*, 607 F.3d at 1025.   Other

---

[109] In *In re Ran*, the Bankruptcy Court for the Southern District of Texas acknowledged that under section 1508 of the Bankruptcy Code, courts are required to consider Chapter 15's "international origin, and the need to promote an application [of Chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." *In re Ran*, 390 B.R. 257, 264 (Bankr. S.D. Tex. 2008) [hereinafter "*Ran-Bankruptcy*"].   The legislative history of Chapter 15 points to the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (hereinafter the "Guide to Enactment") "for guidance as to the meaning and purpose of [Chapter 15's]

courts have generally held that "COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties. Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Fairfield Sentry-Circuit*, 714 F.3d at 130. Stated another way, in determining a debtor's COMI, courts often examine whether the purported COMI would have been ascertainable to interested third parties. *See In re Modern Land*, 641 B.R. at 782 (citing *Fairfield Sentry-Circuit*, 714 F.3d at 130; *In re British Am. Ins. Co.*, 425 B.R. at 912 ("The location of a debtor's COMI should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289 (Bankr. D. Nev. 2009) (considering ascertainability of COMI by creditors in reaching determination of debtor's COMI)). "By examining factors 'in the public domain,' courts are readily able to determine whether a debtor's COMI is in fact 'regular and ascertainable and not easily subject to tactical removal.'" *Id.*

Because section 1502(4) defines foreign main proceeding in the present sense ("'foreign main proceeding' means a foreign proceeding pending in the country where the debtor *has* [its COMI]"), courts are generally required to view the COMI determination in the present. *Ran-Circuit*, 607 F.3d at 1025. Accordingly, "a debtor's COMI should be determined based on its activities at or around the time the Chapter 15 petition is filed," rather than the time the foreign proceeding was initiated; consideration of the debtor's entire operational history is not the proper inquiry. *See id.* (citing *Fairfield Sentry-Circuit*, 714 F.3d at 137). "To offset a debtor's ability to manipulate its COMI" in bad faith,

---

provisions." House Report at 106 n. 101. While the Guide to Enactment does not define COMI, it indicates the concept was taken from the European Union Convention on Insolvency Proceedings (hereinafter the "EU Convention"). *See* UNCITRAL Guide ¶¶ 31, 72. "In turn, the European Union Council Regulation enacting the Convention on Insolvency Proceedings provides some guidance: 'The centre of main interests should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.'" Council Regulation (EC) No. 1346/2000 of 29 May 2000, Preamble ¶ 13 [hereinafter the "EU Regulation"]. *Fairfield Sentry-Circuit*, 714 F.3d at 136; *see also Ran-Bankruptcy*, 390 B.R. at 264 (discussing the EU Regulation).

however, "a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition."[110]  *Fairfield Sentry-Circuit*, 714 F.3d at 133.

## B.   Foreign Nonmain Proceeding.

Under section 1502(5), a "'foreign nonmain proceeding' means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."  11 U.S.C. § 1502(5). Under section 1502(2), an "'establishment' means any place of operations where the debtor carries out a nontransitory economic activity."   *Id.*   Therefore, in order to conclude a debtor has an establishment in a particular location, the Court must find the debtor both (i) has a place of operations in the particular location, and (ii) had been carrying on nontransitory economic activity there at the time the foreign representative brought the petition for recognition in the United States.  *Ran-Circuit*, 607 F.3d at 1026.

While a "place of operations" is not defined under the Bankruptcy Code, the Fifth Circuit noted that "in order to have a 'place of operations' within the definition of establishment, the debtor "must have had 'a place from which economic activities are exercised on the market (i.e. externally)" at the time the foreign representative filed the petition for

---

[110] *See Ocean Rig UDW Inc*, 570 B.R. at 707 (granting foreign main recognition and finding COMI not manipulated in bad faith); *In re Sunac China Holdings, Ltd.*, 656 B.R. 715, 730–31 (Bankr. S.D.N.Y. 2024) (granting foreign main recognition and finding debtor had not "shifted" its COMI in bad faith by choosing Hong Kong as the locus of its restructuring because "Hong Kong was the center of the debtor's business activities not only when it filed its Hong Kong restructuring case, but before that time as well—indeed throughout its entire existence"); *In re Modern Land*, 641 B.R. at 793 (granting foreign main recognition and finding debtor had not engaged in COMI-shifting behavior); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 420 (Bankr. S.D.N.Y. 2014) (granting foreign main recognition and finding joint provisional liquidators did not manipulate debtor's COMI, as the "activities they undertook that had the effect of establishing the debtor's COMI in the Cayman Islands were consistent with their duties as joint provisional liquidators in the[f]oreign [p]roceeding"); *see also In re Pirogova*, 593 B.R. 402, 414–15 (Bankr. S.D.N.Y. 2018) (finding individual debtor's past conduct not a factor the court was required to consider in evaluating whether a Russian Insolvency Proceeding can be recognized as a foreign main proceeding).

recognition. *Id.* at 1027. Moreover, the "the mere presence of assets in a given location does not, by itself, constitute a place of operation." *Id.* Similarly, another court noted that "the terms 'operations' and 'economic activity' require showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just maintenance of property." *In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).

"In the context of corporate debtors, there must be a place of business for there to be an establishment." *Ran-Circuit*, 607 F.3d at 1027 (citing *Bear Stearns-Bankruptcy*, 374 B.R. at 131). In the context of an individual debtor, by "equating a corporation's principal place of business to an individual's primary or habitual residence," the Fifth Circuit posited that "a place of business could conceivably align with [an individual] debtor having a secondary residence or possibly a place of employment in the country where the [foreign representative] claims the [debtor] has an establishment." *Id.*

Similar to a determination of COMI, the use of the present tense in the definitions of foreign nonmain proceeding and establishment supports the conclusion that a court's establishment analysis "should focus on whether the debtor has an establishment in the foreign country where the bankruptcy is pending at the time the foreign representative files the petition for recognition under Chapter 15."[111] *Id.* at 1027. In contrast to COMI, "the existence of an establishment is essentially a factual question, with no presumption in its favor." *Id.* at 1026 (citing *Bear Stearns-District*, 389 B.R. at 338). Courts have noted that the "bar is rather high" to prove that a debtor has an establishment in a particular location. *Id.* (citing *Bear Stearns-Bankruptcy*, 374 B.R. at 131).

---

[111] Moreover, when evaluating establishment, courts generally do not conduct an "establishment-shifting" analysis as is done with COMI. *See id.* (determining establishment without analyzing whether debtor manipulated purported establishment in bad faith).

## II.   SECTION 109(A) OF THE BANKRUPTCY CODE.

As mentioned *supra*, during trial the issue arose as to whether the Siu-Fung Group Debtors qualified to be a debtor under section 109(a) of the Bankruptcy Code.[112]  While the Fifth Circuit has repeatedly described the standard for recognition under 1517 without mention of section 109(a), the court has not yet confronted the issue of whether, as a condition of receiving recognition, a foreign representative must demonstrate the debtor subject to the foreign proceeding may qualify to be a debtor under section 109(a).[113]  Based on the circumstances of the case and the arguments raised by Mr. Lee and the FRs, however, this Court finds answering that question inescapable.[114]

While the text of Code is simple, the issue before the Court has demonstrated itself to be contentious, both across United States Circuit Courts as well as the international insolvency community.[115]

---

[112] *See* ECF No. 98 (moving for summary judgment on issue of whether section 109(a) of the Bankruptcy Code applies to the current proceeding and/or was satisfied).

[113] *See In re Condor Ins. Ltd.*, 601 F.3d 319, 322 (5th Cir. 2010); *Ran-Circuit*, 607 F.3d at 1020–21; *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1045 (5th Cir. 2012).

[114] As laid out *infra*, the Court's determination of whether section 109(a) applies to Chapter 15 would be case dispositive on the Petition for Recognition with respect to the Siu-Fung Group liquidation proceedings.  Both Parties in their respective motions regarding the FRs' Motion for Summary Judgment, as well as their closing briefs, acknowledge that the Court's determination of whether section 109(a) applies, and if so, whether that section was satisfied, may be case dispositive.  Both Parties in their respective filings have asked the Court to advise on whether that section applies.

[115] *See In re Barnet*, 737 F.3d 238, 251 (2d Cir. 2013) (holding section 109(a) applies to Chapter 15); *In re Al Zawawi*, 97 F.4th 1244, 1255 (11th Cir. 2024) [hereinafter "*Al Zawawi-Circuit*"] (holding section 109(a) does not apply to Chapter 15); Donald Glosband & Jay Westbrook, *Chapter 15 Recognition in the U.S.: Is a Debtor "Presence" Required?*, 24 INT. INSOLV. REV. 28–56 (2015) [https://perma.cc/D59D-SPGM] (arguing section 109(a) should not apply as precondition to recognition); 8 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1501.03 (16th ed. rev.2025) (explaining applicability of section 109(a) to Chapter 15).

### A.    Plain Meaning.

The Court's statutory interpretation "begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013) (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)).  The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  The Court's "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *See id.* (citing *U.S. v. Ron Pair Enters, Inc.*, 489 U.S. 235, 240 (1989)).  When the language is plain, this Court "must enforce the statute's plain meaning, unless absurd." *In re Nowlin*, 576 F.3d 258, 261–62 (5th Cir. 2009).  "An absurdity is not mere oddity.  The absurdity bar is high, as it should be.  The result must be preposterous, one that 'no reasonable person could intend.'" *See Texas Brine Co. L.L.C. v. Am. Arbitration Assoc., Inc.*, 955 F.3d 482, 486 (5th Cir. 2020) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 237 (2012)).

The court in *Barnet* analyzed the plain meaning of sections 109(a) and 103(a) succinctly, and this Court need not reinvent the wheel to arrive at the same conclusion that the text of the Code on its face unambiguously states section 109(a) applies to Chapter 15:

> [s]ection 103(a) makes all of Chapter 1 applicable to Chapter 15.  Section 109(a)—within Chapter 1—creates a requirement that must be met for any debtor.  Chapter 15 governs the recognition of foreign proceedings, which are defined as proceedings in which "the assets and affairs of the debtor are subject to control or supervision by a foreign court."  11 U.S.C. § 101(23).  The debtor that is the subject of the foreign proceeding, therefore, must meet the requirements of section 109(a) before a bankruptcy court may grant recognition of a foreign proceeding.

*In re Barnet*, 737 F.3d at 247.

The definitions of "debtor" under Chapter 15 and the debtor eligibility requirement under section 109(a) are reconcilable and not subject to ambiguity.  The context and purpose of section 109(a) and Chapter 15 further assure the Court section 109(a) applies as a precondition to recognition.   Imposing the low-bar eligibility requirement cabined in section 109(a) is not one "no reasonable person could [have] intend[ed]." *See Texas Brine,* 955 F.3d at 486; *In re B.C.I. Fins. Pty Ltd.*, 671 B.R. 669, 676 (Bankr. S.D.N.Y. 2025) (rejecting argument application of section 109(a) resulted in an absurdity).  The Model Law and Guide to Enactment are not dispositive on the issue, but rather expressly contemplate the modification or omission of certain provisions by member-States.[116]   Ultimately, this Court is not in a position to second-guess the decision Congress made in drafting the language of the Code.  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] 'to presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, (1992)).  Section 109(a) applies to Chapter 15, and accordingly the FRs must demonstrate that requirement is satisfied in order to get recognition of the Siu-Fung Group liquidation proceedings and Lee 2001 Bankruptcy.

### *(1)    Interrelated Definitions.*

The FRs attempt to resist this conclusion by arguing nothing within sections 1517(a) and 1515 require section 109(a) be satisfied in order for the Court to recognize the foreign proceeding.[117]  The FRs' argument relies on the assumption that a foreign debtor never becomes a debtor "under [Title 11]" simply by virtue of a United States court granting recognition of a foreign proceeding.  Based on this assumption, section 109(a)'s threshold eligibility requirement, which determines

---

[116] *See supra* note 131.
[117] ECF No. 151, at 60.

"[who] may be a debtor under [Title 11]," would not apply and need not be satisfied to get recognition under section 1517. 11 U.S.C. § 109(a).

While alluring, this argument fails to comport with a straightforward reading of the text. It is true section 1517(a) states the court "shall" grant recognition upon a showing that sections 1517(a)(1) through (a)(3) are satisfied. 11 U.S.C. § 1517(a)(1). To hold section 109(a) inapplicable, however, would ignore the express mandate of section 103(a) to apply Chapter 1 to Chapter 15. 11 U.S.C. § 103(a).

Moreover, such an interpretation would ignore how interrelated terms under Chapter 15 and Chapter 1 are defined. As referred to in section 1517(a), both terms "foreign proceeding" and "foreign representative" are defined under Chapter 1, and both reference and rely on the term "debtor." 11 U.S.C. §§ 101(23), 101(24). Because both terms are defined under Chapter 1, "debtor" as used therein necessarily relies on the same term "debtor" as defined elsewhere in Chapter 1, namely section 101(13). 11 U.S.C. § 101(13). Section 101(13) states "the term 'debtor' means person or municipality concerning which a case under this title has been commenced." *Id.* Section 1504 provides that "a case under Chapter 15," (which is located within Title 11), "is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515." 11 U.S.C. § 1504. And to be a "debtor" under "this title" (*i.e.,* Title 11), section 109(a) mandates an eligibility requirement. 11 U.S.C. § 109(a). Section 1517 depends on the existence of said foreign proceeding and foreign representative, which in turn "expressly contemplates and impliedly depends on the existence of some related 'debtor,'" which, coming full circle, must qualify to be a "debtor under Title 11" by meeting a precondition set out in section 109(a).[118] *See Al Zawawi-Circuit,* 97 F.4th at 1255–56 (Lagoa J., concurring).

---

[118] The court in *Barnet* underwent a similar analysis relating to how relief may be granted under Chapter 15, arriving at a similar conclusion that "the ubiquitous references to a debtor in both Chapter 15 and the relevant definitions of Chapter 1 [] refer to a debtor under the title that contains both chapters." *In re Barnet,* 737 F.3d at 248. The court noted "both the automatic and discretionary relief provisions that accompany recognition of a foreign main proceeding are directed towards debtors. 11

The Court's focus is not on whether the language of the Code is subject to two reasonable interpretations regarding whether a foreign debtor becomes a debtor under Title 11 by virtue of a foreign representative filing a petition for recognition. Framing the issue in such a manner misconstrues the interpretative exercise the Court is tasked with and divines ambiguity into the Court's analysis where none should in fact exist. Regardless of whether the statutes provide clarity on this separate issue, this Court's task is to determine whether the Code is ambiguous as to whether section 109(a)'s eligibility requirement applies to Chapter 15. With respect to that discrete issue, the text is unambiguously clear: yes, section 109(a) applies to Chapter 15.

### (2)   "Debtor" Under Sections 1502(1) And 109(a) Are Reconcilable and Not Ambiguous.

The term "debtor" as defined under section 1502(1) is reconcilable with how the term is used under sections 101(13) and 109(a), and judges have previously articulated so in different ways.[119] Section 1502 defines a debtor "[f]or the purposes of this chapter" as "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502. Assuming *arguendo* that the section 1502(1) definition of "debtor" blocked application of section 109(a) within Chapter 15, Judge Straub writing for the *Barnet* court noted that because section 1502's definition of "debtor" is limited to "this chapter,"—meaning Chapter 15—"it follows that the definitions of 'foreign proceeding' and 'foreign representative' which both occur within Chapter 1, would not be affected" by "debtor" also having been defined under section 1502(1). *In re Barnet*, 737 F.3d at 249. As before:

---

U.S.C. § 1520(a) applies 11 U.S.C. §§ 361–63, 549 and 552 to 'the debtor,' 'the property of the debtor,' or 'an interest of the debtor in property,' as appropriate. Section 362, in turn, provides for *inter alia*, the stay of any 'proceeding against the debtor.' 11 U.S.C. § 362(a)(1); *see also* 11 U.S.C. § 552(a) (governing post-petition "property acquired by the estate or by the debtor"). The discretionary relief provisions follow the same pattern. *See* 11 U.S.C. § 1521 (providing for, *e.g.*, "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative," "staying execution against the debtor's assets," and "granting any additional relief that may be available to a trustee"). *Id.*

[119] *In re Barnet*, 737 F.3d at 248–49; *Al Zawawi-Circuit*, 94 F.4th at 1255–57 (Lagoa J., concurring).

because both "foreign proceeding" and "foreign representative" require a "debtor," the result is unavoidable that "section 109(a) [] must be satisfied in order to meet the requirements contained in Chapter 15 that rely upon those definitions." *Id.*

Judge Straub goes on to correctly note that the section 1502 definition of "debtor" does not, in fact, block application of section 109(a). *Id.* at 249. Sections 101(13) and 1502(1) both start with the phrase "the term 'debtor' means." 11 U.S.C. §§ 101(13), 1502(1). The effect is that the section 1502(1) definition supplants the section 101(13) definition for purposes of Chapter 15. *See In re Barnet*, 737 F.3d at 249 (quoting *Groman v. Comm'r of Internal Revenue*, 302 U.S. 82, 86 (1937) ("When an exclusive definition is intended the word 'means' is employed.")). Section 1502(1) would not, however, supplant the requirements for "a debtor under this title"—as laid out in section 109(a)—as that requirement is not expressly enumerated in the section 101(13) definition.

The FRs support their argument against application of section 109(a) with the United States Court of Appeals for the Eleventh Circuit's holding in *Al Zawawi-Circuit*.[120] The primary reason the *Al Zawawi-Circuit* court held section 109(a) inapplicable, however, was that the court there was bound by precedent which "suggested [] section 109(a) does not apply to cases ancillary to a foreign proceeding." *Al Zawawi-Circuit*, 97 F.4th at 1257 (Lagoa, J., concurring); *see also In re Goerg*, 844 F.2d 1562, 1568 (11th Cir. 1988).[121] *Al Zawawi-Circuit* is not

---

[120] ECF No. 151, at 54–55.

[121] In 1988, in *In re Goerge*, the United States Court of Appeals for the Eleventh Circuit was faced with the issue of whether, as a condition for a United States court to entertain jurisdiction under former section 304 of the Bankruptcy Code, an insolvent decedent's estate subject to liquidation proceedings in Germany needed to "fit under the then-applicable definition of foreign proceeding." *Al Zawawi-Circuit*, 97 F.4th at 1259 (Tjoflat, J., concurring). Section 304 was the predecessor to Chapter 15, pre-BAPCPA. *Id.* at 1252. The *In re Goerg* court held that the term "debtor" as used under former section 304 incorporated the same "debtor" as was defined under applicable foreign law, and that a United States court has jurisdiction to consider a section 304 petition so long as that said debtor qualifies for relief under applicable foreign law, and the foreign proceeding of which said debtor is subject to is "for the purpose of

binding authority on this court, nor is the case on which it relies. Additionally, the majority opinion in *Al Zawawi-Circuit* expressly *agrees* with the *Barnet* court's plain meaning analysis of section 109(a) and only arrives at an alternative conclusion due to its adherence to the prior precedent rule. *Al Zawawi-Circuit*, 97 F.4th at 1251–52, 1257 (Lagoa, J., concurring).

Judge Lagoa, who authored the majority opinion in *Al Zawawi-Circuit*, wrote a special concurrence where she rejected the notion that section 1502(1) and section 109(a) irreconcilably conflict. *Id.* at 1255–57. Again, section 1502(1) defines debtor for purposes of Chapter 15 to mean "an *entity* that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1). Section 109(a) "limits debtors under Title 11 to '*person[s]* that reside [] or [have] a domicile, a place of business, or property in the United States' and '*municipalit[ies]*.'" *Al Zawawi-Circuit*, at 1256 (Lagoa, J., concurring); 11 U.S.C. § 109(a). The term "debtor" under section 101(13) "means *person* or *municipality* concerning which a case under this title has been commenced." 11 U.S.C. § 101(13). "Entity" under section 101(15) "*includes* person, estate, trust, governmental unit, and United States trustee." 11 U.S.C. § 101(15). Because section 1502(1) pertains to "entit[ies]," which includes terms such as "estate[s], trust[s]," and certain kinds of "governmental unit[s]" expressly omitted from debtor eligibility under section 109(a), one naturally spots a potential conflict where the "entity subject to the foreign proceeding" happens to be, perhaps, a decedent's estate subject to liquidation. The *Al Zawawi-Circuit* court was not, however, faced with an estate, nor a trust nor governmental unit. *Al Zawawi-Circuit*, 97 F.4th at 1256 (Lagoa, J., concurring). And neither is this Court. Both the Siu-Fung Group Debtors and Mr. Lee would be "persons" under section 101. 11 U.S.C. § 101(41).

---

liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization." *See id.* at 1253 (citing *In re Goerg*, 844 F.2d at 1567–68). The *Al Zawawi-Court* found the "then-applicable" definition of foreign proceeding under the pre-BAPCPA Code largely the same as the current version in the Code. *Id.* at 1252.

> And, with respect to persons, [sections] 1502(1) neither contains its own, contrary residency/property requirement, nor clearly spurns the possibility of any such requirement. Thus, as far as this case is concerned, [sections] 1502(1) and [] 109(a) can easily be read in harmony: [section] 1502(1) recognizes that persons can be debtors in Chapter 15 cases, and [section] 109(a) imposes a residency/property requirement that must be satisfied for a person to be qualified as a debtor.

*See Al Zawawi-Circuit*, 97 F.4th at 1256 (Lagoa, J., concurring) (citing SCALIA & GARNER, *supra* at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.")). Similarly, this Court finds nothing ambiguous about how section 1502(1) provides a chapter-specific definition of debtor for purposes of Chapter 15, while section 109(a) simultaneously imposes a debtor eligibility requirement to be a debtor under the entirety of Title 11.

### *(3)*    *Context and Purpose.*

With the FRs main argument addressed, the Court moves on to a few limited points regarding the context and purpose of section 109(a) which supports its conclusion that section 109(a) applies to Chapter 15. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341.

First, as the court in *Barnet* noted, Congress "amended section 103 to state that Chapter 1 applies to Chapter 15 at the same time [] it enacted Chapter 15," which "strongly supports the conclusion that Congress intended section 103(a) to mean what it says, namely that Chapter 1 applies to Chapter 15."[122]  *In re Barnet*, 737 F.3d at 250.  This

---

[122] *See* BAPCPA, §§ 801–802; *cf. U.S. v. Battista*, 575 F.3d 226, 234 (2d Cir. 2009) ("[W]hen two sections [] share the same purpose, the parallel provisions can, as a matter of general statutory construction, be interpreted to be *in pari materia*." (internal quotation marks omitted)).

Court agrees.  Congress could have precluded the application of section 109(a) to Chapter 15 in a number of ways, including creating an express carveout under section 103(a) that section 109(a) would not apply as a precondition to recognition under section 1517; moving the pre-BAPCPA definitions of "foreign proceeding" and "foreign representative" out of section 101 and into section 1501; defining "debtor" under section 1502(1) in a manner that did not necessarily contemplate and rely on "debtor" as used in various other special terms defined under Chapter 1; or including an express limitation as to the applicability of section 109(a) under some provision in Chapter 15, as was done with section 109(b) under section 1501(c).  None of this done, nor any alternative avenue provided for interpreting the plain meaning of the text—as drafted—to reflect a conclusion other than that section 109(a) applies.

Second, both the *Barnet* court as well as Judge Lagoa writing in concurrence for *Al Zawawi-Circuit* were unconvinced that application of section 109(a) would be inconsistent with section 1528[123] and the venue statute provided under 28 U.S.C. § 1410.[124]  11 U.S.C. § 1528; 28 U.S.C.

_____

[123] Section 1528 states "[a]fter recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States."  11 U.S.C. § 1528.  Again, section 109(a) requires "a domicile, a place of business, or property in the United States" in order to be a debtor under Title 11.  11 U.S.C. § 109(a).  Under one possible reading, application of section 109(a)'s requirement to be a debtor under Title 11 might render part of section 1528 superfluous.  According to the *Barnet* court, however, "there is nothing contradictory nor disharmonious about applying [s]ection 109(a) to Chapter 15 and then further requiring that [s]ection 1528 [be] met before a case under another chapter of Title 11 may be commenced."  *In re Barnet*, 737 F.3d at 250.  Moreover, Judge Lagoa noted that "there are potential cases where a debtor satisfies [section] 109(a) but not [section] 1528's asset requirement," such as the case of "an individual debtor who might reside in the United States without personally owning any assets in the country," or "a municipal debtor [that] might not itself own any assets at all."  *Al Zawawi-Circuit*, 97 F.4th at 1256 (Lagoa, J., concurring).  "In such cases, [section] 1528's asset requirement certainly has an effect: it prohibits the commencement of a case under any other Chapter of [T]itle 11."  *Id.*

[124] 28 U.S.C.  § 1410 is the Chapter 15 venue statute, and provides "[a] case under [C]hapter 15 of [T]itle 11 may be commenced in the district court of the United States for the district—(1) in which the debtor has its principal place of business or principal assets in the United States; (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action

1410.  This Court agrees.  "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538–539 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)); *see also Williams v. Taylor*, 529 U.S. 362, 404 (2000) (describing this rule as a "cardinal principle of statutory construction"); *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").  Neither section 1528 nor 28 U.S.C. § 1410 are rendered superfluous by virtue of applying section 109(a) to Chapter 15.

Finally, the Court must consider whether application of section 109(a) is consistent with the purpose of Chapter 15, which as noted *supra*, "is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency."[125]  11 U.S.C. § 1501(a).[126]  The court in *Barnet* found none

---

or proceeding in a Federal or State court; or (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative."  28 U.S.C. § 1410.  Under one potential reading, if section 109(a) was made applicable to Chapter 15, then "every debtor who satisfied [section] 109(a) necessarily will have a 'principal place of business or principal asset in the United States,' and [would] therefore satisfy [section] 1410(1), rendering subsections (2) and (3) meaningless in all cases."  *Al Zawawi-Circuit*, 97 F.4th at 1257 (Lagoa, J., concurring).  Similar to section 1528, however, Judge Lagoa noted that a debtor "might satisfy [section] 109(a) through residence or domicile in the United States but not have a principal place of business or principal property in the United States and therefore not satisfy [section] 1410(1).  In such cases, [sections] 1410(2) and (3) would come into play and determine where venue lies."  *Id.*

Conversely, sections 1410(2) and (3) expressly provide venue for Chapter 15 cases even when "the debtor does not have a place of business or assets in the United States."  *In re Barnet*, 737 F.3d at 250.  Based on this, one might conclude section 109(a) was not meant to be applied to Chapter 15.  *Id.*  The *Barnet* court, however, characterized section 1410 as "purely procedural," and reasoned that "allow[ing] the venue statute to control" whether section 109(a) applied to Chapter 15 over the "unambiguous [] substantive [] and restrictive language used in [s]ections 103 and 109 "would be to allow the tail to wag the dog."  *Id.*

[125] *See supra* note 108 and accompanying text.

[126] The express of objectives of Chapter 15 cabined in section 1501(a) are noted *supra*.

of the express objectives laid out in section 1501(a) dispositive on the issue, "as they could all be accomplished with or without imposition of [s]ection 109(a)." *In re Barnet*, 737 F.3d at 251.

One court recently found that the manner in which courts have historically applied section 109(a) post-*Barnet* has been entirely consistent with the purpose of Chapter 15. *See In re B.C.I. Fins. Pty Ltd.*, 671 B.R. at 678. Section 109(a) merely requires a debtor to have property in the United States; "it says nothing about the amount of such property nor does it direct that there be any inquiry into the circumstances surrounding the debtor's acquisition of the property." *In re Octaviar Admin. Pty Ltd*, 511 B.R. 361, 373 (Bankr. S.D.N.Y. 2014). Accordingly, courts in the Second Circuit have routinely found section 109(a) satisfied where, pre-petition for recognition, a retainer is paid to counsel on behalf of the debtor and held in a United States bank account. *Id.* at 373–75; *see In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 293–94 (Bankr. S.D.N.Y. 2018) (collecting cases). This is potentially a low bar. One so low that, as one court recently put, it could be "[surmounted] by virtually any well-counseled company in the world." *In re B.C.I. Fins Pty Ltd.*, 671 B.R. 677–78. Allowing debtors who otherwise have no property or presence in the United States to more easily file for recognition under Chapter 15 furthers the statutory objectives laid out in section 1501—"namely, cooperation between U.S. and foreign courts, fair and efficient cross-border administration, and maximization of the value of the debtor's assets." *Id.* at 678; 11 U.S.C. § 1501(a)(1), (3) & (4).

## B.    Section 1508.

Generally, a court's statutory interpretation only leads to consideration of legislative history if the text is ambiguous. Here, the text is not. Chapter 15, however, contains an express interpretation provision which mandates courts "consider [the chapter's] international origin, and the need to promote an application of [the chapter] that is consistent with the application of similar statues adopted by foreign jurisdictions." 11 U.S.C. § 1508. As laid out *supra*, the legislative history of Chapter 15 points to the Guide to Enactment "for guidance as

to the meaning and purpose of [Chapter 15's] provisions."[127]  The *Barnet* court acknowledged that while "the Model Law does not contain an express requirement akin to section 109(a)," it also expressly leaves open the possibility that "a State may modify or leave out some of its provisions."[128]  Accordingly, the Model Law does not provide clear or instructive guidance on the issue.  "Regardless, the omission of section 109(a), or its equivalent, from the Model Law does not suffice to outweigh the express language Congress used in adopting sections 109(a) and 103(a)."  *In re Barnet*, 737 F.3d at 251.

While the Fifth Circuit has repeatedly emphasized the need to rely on the Model Law and Guide to Enactment when interpreting Chapter 15,[129] the fact that the court has not yet considered whether section 109(a) is a precondition to recognition under section 1517 is not dispositive on whether that section was meant to apply in accordance with the mandate of section 103(a).  Regardless, this Court's plain meaning analysis, as well as the analyses of the court in *Barnet* and Judge Lagoa's concurrence in *Al Zawawi-Circuit* demonstrate section 109(a) applies to Chapter 15 as a precondition to recognition.

## DISCUSSION

The FRs originally sought recognition for the Lee 2001 Bankruptcy, the Lee 2023 Bankruptcy, and the Siu-Fung Group liquidation proceedings.[130]  Over the course of the ten-day trial, the Parties' arguments narrowed, along with the relief sought by the FRs, and by the time evidence closed the FRs only sought recognition of the Lee 2001 Bankruptcy and the Siu-Fung Group liquidation proceedings.[131]  Mr. Lee opposed recognition of each proceeding from the start and continues to stand on his Amended Motion to Dismiss.[132]

---

[127] *See supra* note 108 and accompanying text; *see* House Report.

[128] *See* Guide to Enactment at Part 2 ¶ 12.

[129] *In re Condor Ins. Ltd.*, 601 F.3d at 321; *Ran-Circuit*, 607 F.3d at 1020–21; *In re Vitro S.A.B. de CV*, 701 F.3d at 1044.

[130] ECF No. 1; ECF No. 2; ECF No. 97.

[131] ECF No. 151.

[132] ECF No. 41; ECF No. 152.

For the reasons discussed below, the Court must deny recognition as to both the Siu-Fung Group liquidation proceedings, as well as the Lee 2001 Bankruptcy.

## I.   SIU-FUNG GROUP LIQUIDATION PROCEEDINGS.

With respect to the Siu-Fung Group liquidation proceedings, the FRs argue each of the requirements for recognition under section 1517 are satisfied and ask the Court to recognize the liquidation as a foreign main proceeding.[133]  With respect to section 109(a), the FRs argue the Siu-Fung Group Debtors have two forms of assets in the United States sufficient to satisfy the debtor-eligibility requirement: (i) potential claims the Debtors allegedly have against Mr. Lee and third parties in the United States based on the allegedly fraudulent transfer of BSW assets before, during, and after the Siu-Fung Group liquidation proceedings (hereinafter the "Potential Claims") and (ii) the post-petition Archer Retainer deposited by the FRs into Archer's client trust account on behalf of the Siu-Fung Group.[134]

Mr. Lee opposes recognition of the Siu-Fung Group liquidation proceedings on grounds that (i) the FRs have not proven the liquidation proceedings are foreign proceedings within the meaning of section 101(23), and (ii) the FRs have not proven that any of the Siu-Fung Group Debtors had any assets in the United States at the time of the filing of the petition for recognition.[135]

The Court concludes that while the requirements of section 1517 are otherwise satisfied and the Siu-Fung Group liquidation proceedings are foreign main proceedings, the FRs have failed to demonstrate the Siu-Fung Group Debtors had a presence in the United States at the time of the filing of the Chapter 15 petition, and therefore section 109(a) is not satisfied.  Accordingly, the petition for recognition as to the Siu-Fung Group liquidation proceedings must be denied.

---

[133] ECF No. 2 at 2.

[134] ECF No. 151 at 62.

[135] ECF No. 152, at 15, 19.

A.   SECTION 1517.

*(1)   The   Liquidation   Proceedings   are   Foreign Proceedings, and Messrs. Tang and Kan are Foreign Representatives.*

The Court first notes the Siu-Fung Group liquidation proceedings constitute foreign proceedings within the meaning of section 101(23).  11 U.S.C. § 101(23).  A "foreign proceeding" under section 101(23) of the Bankruptcy Code means a "judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."  Courts have interpreted section 101(23) of the Bankruptcy Code as having the following seven requirements:

(1) a proceeding;
(2) that is either judicial or administrative;
(3) that is collective in nature;
(4) that is in a foreign country;
(5) that is authorized or conducted under a law related to insolvency or the adjustment of debts;
(6) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and
(7) which is for the purpose of reorganization or liquidation.

*See In re Betcorp Ltd.*, 400 B.R. at 277; *In re ABC Learning Ctrs. Ltd.*, 728 F.3d at 308; *In re Gold & Honey, Ltd.*, 410 B.R. 357, 368, 369–70 (Bankr. E.D.N.Y. 2009); *In re Brit. Am. Ins. Co.*, 425 B.R. at 901–02.

Each of the Siu-Fung Group Debtors are in active liquidation proceedings in Hong Kong before the HK High Court, subject to adjudication under Hong Kong Law, specifically Chapter 32 of the Hong Kong Bankruptcy Ordinance, also referred to as the Companies Winding Up and Miscellaneous Provisions Ordinance (also referred to as "CWUMPO"), which governs the winding up of companies in Hong

Kong.[136]  Prongs (1), (2), (4), (5), and (7) of the *Betcorp* test are therefore satisfied.  *In re Betcorp Ltd.*, 400 B.R. at 277.

The term "collective" within the definition of foreign proceeding means the proceeding is "one that considers the rights and obligations of all creditors."  *See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (Bankr. S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*, 400 B.R. at 276–77; *In re Brit. Am. Ins. Co.*, 425 B.R. at 902 ("For a proceeding to be collective within the meaning of section 101(23), it must be instituted for the benefit of creditors generally rather than for a single creditor or class of creditors.").  The Siu-Fung Group liquidation proceedings evidently provided creditors notice, permitted secured and unsecured creditors alike to file claims and potentially received distributions, held creditors meetings, and granted voting rights to creditors with respect to certain aspects of those proceedings.[137]  That the majority of creditors have yet to receive a distribution in those proceedings does not render them not collective within the meaning of section 101(23).  *See ABC Learning Ctrs. Ltd.*, 445 B.R. 318 (ruling Australian liquidation proceeding collective because *inter alia* the proceeding entitled creditors to a meaningful claims process, even if those creditors would not receive meaningful distributions).  Prong (3) of the *Betcorp* test is therefore satisfied.  *In re Betcorp Ltd.*, 400 B.R. at 277.

As part of their liquidation proceedings, all assets and liabilities of the Siu-Fung Group Debtors were subject to the control or supervision of the HK High Court, as overseen by Messrs. Tang and Tam as joint-liquidators in 2000, and then Messrs. Tang and Kan in 2016.

---

[136] *Tang Trial Testimony*, ECF No. 75, at 75 ¶¶ 17—22.

[137] *Tang Trial Testimony*, ECF No. 75, at 31 ¶¶ 19–22, 40 ¶¶ 13–18, 56 ¶¶ 18–25, 66 ¶¶ 4–6, 75 ¶¶ 1–12, 77 at 17–18, 80 ¶¶ 16–20, 93 ¶¶ 15–20.  Another court in the United States recently found a bankruptcy proceeding before the HK High Court to be "collective" within the meaning of section 101(23).  *See In re Sunac China Holdings, Ltd.*, 656 B.R. at 719, n. 3 (restating court's previous bench ruling that HK High Court proceeding constituted a "foreign proceeding" within the meaning of section 101(23)).

Accordingly, prong (6) of the *Betcorp* test, along with all (7) other prongs, are satisfied. *In re Betcorp*, 400 B.R. at 277.

The Court next notes that Messrs. Tang and Kan and Ms. Hou each meet the definition of foreign representatives under section 101(24). 11 U.S.C. § 101(24). A "foreign representative" under section 101(24) of the Bankruptcy Code means a "person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." *Id.* Messrs. Tang and Kan, and Ms. Hou each are persons under section 101(41) because each are individuals. 11 U.S.C. § 101(41). Messrs. Tang and Kan were authorized by the HK High Court to administer the liquidation of the Siu-Fung Group Debtors' assets in 2016. Mr. Tang and Ms. Hou were appointed as trustees to the Lee 2001 Bankruptcy, which constitutes a representative of such proceeding within the meaning of section 101(24). 11 U.S.C. § 101(24).

### (2) *The Siu-Fung Group Liquidation Proceedings Are Foreign Main Proceedings.*

The Court recognizes Hong Kong as the Siu-Fung Group Debtors' COMI. As outlined above, a foreign main proceeding is a foreign proceeding "pending in the country where the debtor has its COMI." 11 U.S.C. § 1517(b)(1). The FRs assert the Siu-Fung Group Debtors' COMI is in Hong Kong and Mr. Lee does not dispute this.[138] Whether the requirements of section 1517 are satisfied is not, however, a "rubber stamp exercise." *Ran-Circuit*, 607 F.3d at 1021 (citing *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008)). "Even in the absence of an objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant." *Id.* (citing *Bear Stearns-District*, 389 B.R. at 335). In doing so, the Court may "consider any and all relevant facts (including facts not yet presented) . . . ." *In re Geden Holdings,*

---

[138] ECF No. 151, at 34.

*Ltd.*, 2025 WL at *5 (citing *Basis Yield Alpha Fund (Master)*, 381 B.R. at 40).

"COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *See In re Sunac China Holdings, Ltd.*, 656 B.R. at 729–30 (quoting *Fairfield Sentry-Circuit*, 714 F.3d at 130)). Because of the statutory presumption under section 1516(c), creditors could reasonably have concluded that each of the Siu-Fung Group Debtors' (besides SFCCC) registered offices in Hong Kong was their COMI.[139] *In re Modern Land (China) Co., Ltd.*, 641 B.R. at 789.

Each of the Siu-Fung Group Debtors are holding companies that have been in liquidation proceedings in Hong Kong since 2000. While those companies may have conducted different business activities between the years of their incorporation and eventual liquidation in 2000, for the last twenty-five years their primary business activities, if any, have centered around a potential restructuring and liquidation. *See In re Sunac China Holdings, Ltd.*, 656 B.R. at 730. Such activities at one time included *inter alia* selling portions of the Siu-Fung Group's joint ventures, including the BSW Sale, in order for the purchaser to quickly relist them.[140] Later and more recently, those activities purportedly centered around recovering assets allegedly fraudulently transferred out of the Debtors' estate.[141] Such business activities, and the decision-making central to those activities, have evidently been conducted by the Siu-Fung Group joint-liquidators and interested third parties in Hong Kong before the HK High Court. Accordingly, because Hong Kong is the jurisdiction where the Siu-Fung Group has been regularly conducting its business activities as of the date of the filing of

---

[139] ECF No. 2, Ex. 1-B. NHD Holdings, NHD Asia, and SFC each are Hong Kong incorporated companies, and each of their registered offices are in Hong Kong. SFCH was originally a Bermuda company, which was registered in Hong Kong under Chapter 32 in 1993, and its principal place of business was moved to Hong Kong shortly thereafter. SFCCC is a BVI company. SFCCC's registered office is a post office box in the BVI, and its principal place of business is in Hong Kong.

[140] *See supra* note 43 and accompanying text.

[141] *See supra* note 29.

the petition for recognition, interested third parties would readily ascertain the Group's COMI laying there. *In re Sunac China Holdings, Ltd.*, 656 B.R. at 730 (holding Hong Kong was "the center of a restructuring [holding company's] business activities and decision-making" both at the time of the filing of the Chapter 15 petition "and during the time between its Hong Kong and [C]hapter 15 filings."). This is not a case of COMI shifting. *See Fairfield Sentry-Circuit*, 714 F.3d at 133.

Application of the *SPhinX* factors also supports a finding that COMI lays in Hong Kong. *SPhinX-Bankruptcy*, 351 B.R. at 117. Each of the Siu-Fung Group Debtors'—with the exception of SFCH and SFCCC—registered offices are in Hong Kong. Both SFCH and SFCCC have their principal place of business in Hong Kong. The Debtors are each subject to liquidation proceedings overseen by the HK High Court through joint-liquidators Mr. Tang and Mr. Kan. Mr. Tang and Mr. Kan are both employed by ShineWing Hong Kong, an accounting firm whose business address is listed in Hong Kong. The location of the Siu-Fung Group's primary assets is somewhat unclear—indeed, the location of those assets is a purported basis for the current petition for recognition—and thus this factor is not dispositive. Given the previous size and scope of the companies as well as the limited evidence presented on the issue, it is not necessarily clear where a majority of the Siu-Fung Group's creditors exist.[142] Choice of law principles support a finding of COMI in Hong Kong. *Fairfield Sentry-Circuit,* 714 F.3d at 130. While Debtors within the Group may have been originally incorporated in different jurisdictions, as of the date of the Chapter 15 petition each were subject to Hong Kong law and Hong Kong regulations vis-à-vis the liquidation proceedings before the HK High Court.[143] Hong Kong is the jurisdiction whose law would apply to most disputes over corporate

---

[142] Regardless, that many of those purported creditors evidently filed claims in the liquidation proceedings with the HK High Court indicates interested third parties readily ascertained Hong Kong as each of the Debtor's COMI. *See supra* note 137 and accompanying text.

[143] ECF No. 2, Ex. 1-B.

actions that take place in those liquidation proceedings. *In re Modern Land*, 641 B.R. at 791.

Accordingly, because the Siu-Fung Groups' COMI are all located in Hong Kong, the liquidation proceedings before the HK High Court are appropriately characterized as foreign main proceedings in satisfaction of section 1517(a)(1). 11 U.S.C. § 1517(a)(1).

### B. DEBTOR-ELIGIBILITY UNDER SECTION 109(A) IS NOT SATISFIED.

#### (1) *The Archer Retainer Does Not Satisfy Section 109(a).*

The FRs argue the Archer Retainer deposited post-petition serves as a basis for satisfying the debtor eligibility requirement under section 109(a).[144] The FRs claim that as of the date of the petition for recognition, they "did not believe they could use the [Siu-Fung Group Debtor's] funds on hand in accounts with the Hong Kong Official Receivers [] to pay a retainer to U.S. counsel."[145] According to the FRs, after learning the funds could so be used, on April 9, 2025, Mr. Tang wired the Archer Retainer to his counsel and sought reimbursement from the Hong Kong Official Receiver.[146] As such, the Archer Retainer ended up being paid nearly nine months after the date of the petition for recognition. The FRs, however, argue the Court should place "form over substance [*sic*]" and find the post-petition retainer constitutes property in the United States in satisfaction of section 109(a) because otherwise, the FRs "would be forced to spend substantial additional time and costs to file a second Chapter 15 Petition."[147]

Mr. Lee offers two objections to the retainer serving as a basis to satisfy section 109(a). First, according to Mr. Lee, Mr. Tang paid the Archer Retainer of behalf of himself, the Siu-Fung Group Debtors are not represented by Archer, and there has been no showing that the

---

[144] ECF No. 151, at 62.
[145] *Id.* at 65; ECF No. 112-3; ECF No. 97, at ¶¶ 7, 10.
[146] ECF No. 97, at ¶¶ 8, 11.
[147] ECF No. 151, at 55–56.

money used for the Retainer belonged to any of the Siu-Fung Group Debtors or was ever sent by the Hong Kong Official Receiver to Mr. Tang out of the Siu-Fung Group Debtors' accounts.[148]  Second, Mr. Lee argues that because debtor eligibility under section 109(a) is measured as of the date of the petition for recognition, a retainer paid nearly nine months after the date of the petition does not satisfy section 109(a).[149]  Moreover, according to Mr. Lee, the FRs have no precedential basis to argue a post-petition retainer satisfies section 109(a) as no court which applies section 109(a) to Chapter 15 has previously held so.[150]  The Court agrees with Mr. Lee's second argument.

Pursuant to section 109(a), in order to get a foreign proceeding recognized, the foreign representative must demonstrate the debtor has "a domicile, a place of business, or property in the United States."  11 U.S.C. § 109(a).  With respect to the property requirement, the statute simply says the debtor must have property, but does not specify the amount of such property, nor does it direct an inquiry in the circumstances surrounding the debtor's acquisition of the property.  *In re Octaviar Admin. Pty Ltd.*, 511 B.R. at 373.  As noted above, courts applying section 109(a) to Chapter 15 have routinely found an undrawn retainer in the possession of foreign representatives' counsel to constitute "property in the United States" sufficient to satisfy the debtor-eligibility requirement.  *Id.* at 373–74; *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. at 293–94 (collecting cases).  As Mr. Lee correctly points out, however, the use of the present tense in section 109(a) ("only a person that resides or *has*…property") requires that debtor-eligibility be measured as of the date of the filing of the petition for recognition.[151]  11 U.S.C. § 109(a).  Stated another way, with respect to using an undrawn retainer to satisfy section 109(a), the foreign representative must deposit that retainer with counsel into a United States bank account

---

[148] ECF No. 152, at 18, 20–21.
[149] *Id.* at 19.
[150] *Id.* at 21.
[151] ECF No. 152, at 19.

before the petition for recognition is filed. *See In re Barnet*, 737 F.3d at 250; *In re Octaviar Admin. Pty Ltd.*, 511 B.R. at 373.

Here, the retainer was paid to Archer on April 9, 2025, nearly nine months after the petition date. Therefore, the retainer cannot serve as a basis for satisfying section 109(a), because those funds were not property the Siu-Fung Group Debtors "ha[d]" in the United States at the time the petition for recognition was filed. 11 U.S.C. § 109(a). To hold otherwise would be counterintuitive. It would be illogical for the Court in one breath to hold section 109(a) imposes a debtor-eligibility requirement at the time the petition for recognition is filed, and in the same breath hold section 109(a) satisfied based on a retainer deposited months after the petition was filed.

Given the Archer Retainer cannot serve as a basis for satisfying section 109(a), the Parties' other arguments regarding whether Mr. Tang paid the Retainer on behalf of himself, and whether the FRs sufficiently proved those funds were authorized for use by the Hong Kong Official Receivers are moot and need not be addressed.

### (2) *The FRs' Potential Claims Do Not Satisfy Section 109(a).*

The FRs argue their Potential Claims against Mr. Lee and third parties in the United States for allegedly fraudulent transfers of Siu-Fung Group and BSW assets constitute property in the United States sufficient to satisfy section 109(a).[152] According to the FRs, by demonstrating to this Court the underlying facts and nature of those claims, proving those claims have been "considered [] in concept" by the HK High Court, and proving the HK High Court has granted the FRs extended discovery of Mr. Lee and his family members in Hong Kong in relation to those claims, the FRs have satisfied some unarticulated "burden of proof" required to demonstrate those Potential Claims constitute property in the United States.[153] According to the FRs,

---

[152] ECF No. 151, at 62.

[153] *Id.*

"nothing more should be required for this Court to find that" the FRs' Potential Claims satisfy the property requirement under section 109(a).[154]

Mr. Lee objects to the FRs' Potential Claims serving as a basis to satisfy section 109(a). Mr. Lee attacks the validity of the FRs' purported Claims, arguing the FRs' allegations regarding such are false.[155] Mr. Lee correctly points out that to date no such claims have been filed in any court, and Mr. Tang has yet to show a court any such claims conclusively exist over the last 25 years.[156] According to Mr. Lee, the FRs have failed to state a claim under FED. R. CIV. P. 12(b)(6).[157]

The Fifth Circuit has previously stated that claims and causes of action constitute "property" of the debtor despite being intangible. *See In re Equinox Oil Co., Inc.*, 300 F.3d 614, 618 (5th Cir. 2002) (quoting *U.S. v. Whiting Pools, Inc.*, 462 198, 204–05 & n. 9 (1983) ("Section 541 is read broadly and is interpreted to 'include all kinds of property, including tangible or intangible property, [and] causes of action. . . .'")). The FRs are correct in stating that, in certain circumstances, courts applying section 109(a) to Chapter 15 have found the debtor-eligibility requirement satisfied based on the debtor having potential causes of action in the United States as of the date of the petition for recognition. *In re Octaviar Admin. Pty Ltd*, 511 B.R. at 372; *In re Zawawi*, 634 B.R. 11, 21 (Bankr. M.D.Fla. 2021) [hereinafter "*Al Zawawi-Bankruptcy*"]. But the FRs' reliance on those cases is fundamentally misplaced for two interrelated reasons. First, the courts in those cases did not expressly articulate the burden of proof required to demonstrate that a potential cause of action exists as to satisfy the property requirement under section 109(a). Second, where those courts found that unarticulated burden of proof satisfied, such conclusions were based on facts too

---

[154] *Id.* at 63.
[155] ECF No. 152, at 18.
[156] *Id.*
[157] *Id.* at 14.

distinct from those found here to warrant the conclusion that section 109(a) is satisfied.

The court in *In re Octaviar* held a foreign debtor's potential causes of action against United States entities served as an independent basis for finding section 109(a)'s property requirement satisfied. *In re Octaviar Admin. Pty Ltd*, 511 B.R. at 369–70. There, the foreign representatives had previously filed a petition (hereinafter "*Octaviar I*") for recognition in which they expressly stated they were seeking recognition of an Australian liquidation proceeding "to investigate potential assets in the United States in the form of claims or causes of action against entities located [here] and, if necessary, to prosecute th[ose] assets in the United States."[158] *Id.* at 370. At the time the *Octaviar I* petition was filed, the foreign representatives had not yet filed any claims against entities in the United States on account of those potential causes of action. *Id.* The petition was granted, but the United States Court of Appeals for the Second Circuit reversed, on grounds that the Bankruptcy Court had failed to apply section 109(a) as a condition of receiving recognition. *In re Barnet*, 737 F.3d at 251.

Before filing a second petition for recognition, the foreign representatives commenced litigation against those entities in the United States District Court for the Southern District of New York and the New York Supreme Court asserting the same potential causes of action referred to in the *Octaviar I* petition. *In re Octaviar Admin. Pty Ltd*, 511 B.R. at 370. Afterwards, the foreign representatives filed a second petition for recognition (also referred to as "*Octaviar II*"). There, the Bankruptcy Court concluded section 109(a) was satisfied based on the debtor's potential causes of action, but only found the burden associated with section 109(a) satisfied because the foreign representatives had actually filed lawsuits in federal and state court on account of those potential claims. *Id.* at 370–71. Here, the FRs have not

---

[158] *See also Octaviar I*, ECF No. 16, at ¶¶ 5, 16.

filed any lawsuits on account of their alleged Potential Claims, so that portion of the *In re Octaviar* holding is inapplicable.

The FRs' reliance on *Al Zawawi-Bankruptcy* comes closer to the mark. There the Bankruptcy Court considered the foreign representatives' potential claims to be property sufficient to satisfy section 109(a) despite those claims not yet having been filed as of the date of the petition for recognition.[159] *Al Zawawi-Bankruptcy*, 634 B.R. at 21. Those claims, however, would purportedly have been against entities located in the United States, for the fraudulent transfer of shares in a Florida-based corporation that owned real estate in the United States. *Id.* It is clear a United States court would have had jurisdiction over those claims had the foreign representative pursued them, because those claims would have involved assets located in the United States both at the time the transfer was made and at the time the petition for recognition was filed, and the transfer occurred at least within the lookback period for a fraudulent transfer under United States Bankruptcy Law. *Id.* at 15; 11 U.S.C. § 548(a)(1); *see also* 11 U.S.C. § 544.

The facts in the current case are distinct. While the FRs of the Siu-Fung Group might have *putative* claims against United States-based entities such as Mr. Lee and other third parties,[160] those claims would be (i) for assets originally located in Hong Kong and the PRC at the time the fraudulent transfers allegedly occurred, and (ii) based on conduct originally occurring nearly 25 years ago.[161] Whether those same

---

[159] In *Al Zawawi-Bankruptcy*, a foreign debtor transferred a 60% ownership interest in a Florida-based corporation that owned real estate in the United States to an insider four months before being subject to an involuntary bankruptcy proceeding in the United Kingdom. *Al Zawawi-Bankruptcy*, 634 B.R. at 15. Later, a foreign representative of the UK bankruptcy proceeding filed a petition for recognition in the Bankruptcy Court for the Middle District of Florida. *Id.* The Bankruptcy Court granted recognition, holding the potential claims against third parties with respect to the debtor's ownership transfer "could be considered property" sufficient to satisfy section 109(a). *Id.* at 21.

[160] ECF No. 151 at 54, n. 26.

[161] *See supra* note 65 and accompanying text.

assets are currently in the United States as of the date of the petition for recognition remains to be seen but needs not be determined to decide the section 109(a) issue at hand.[162]

To fit within that portion of the *Al Zawawi-Bankruptcy* holding which suggests un-filed causes of action for fraudulent transfers constitute property in the United States would require this Court to make a preliminary factual finding that (i) the same assets transferred out of the Siu-Fung Group prior to the liquidation proceedings in 2000 and during the BSW Sale are the same assets now in the hands of Mr. Lee and related third parties (*e.g.*, Roy USA) in the United States, and (ii) those assets were transferred fraudulently so as to give rise to potential causes of action.  But the disputed nature of these factual findings is the purported genesis for this Chapter 15 proceeding; indeed, the FRs claim they need more discovery.[163]  But the FRs have not yet persuaded the HK High Court these hypothetical preliminary facts are conclusively true, despite having nearly nine years of extended discovery of Mr. Lee and his family members vis-à-vis the 2016 Lam S29 Orders.[164]  As the FRs aptly put, those claims remain "considered in concept" to be sure, but this Court needs more to support a finding that those claims constitute property in the United States today.

---

[162] The *Al Zawawi-Bankruptcy* court did not rule on the merits of the foreign representatives' potential causes of action, but rather ruled those causes of action would be assets in the United States based on the facts of that case: (i) the ownership interest the foreign debtor transferred was a United States asset at the time the transfer occurred, (ii) the ownership interest was a United States asset at the time the petition for recognition was filed, (iii) the transfer occurred within the lookback period for a fraudulent transfer under United States Bankruptcy law.  *Al Zawawi-Bankruptcy*, 634 B.R. at 15, 21.  The *Al Zawawi-Bankruptcy* court stated no other facts on the record that were relevant to its determination that those potential claims were property in the United States under section 109(a).  *Id.*  And none of those facts have been conclusively proven here.

[163] ECF No. 151, at 62.

[164] *See supra* notes 59–65, 83–84, 86–88 (describing factual findings and orders issued by Justice Lam and Judges Harris and Man of the HK High Court with respect to the FRs' purported claims against Mr. Lee, his family members, and related third parties).

This Court's holding is limited to the exceptional facts surrounding Messrs. Lee and Tang's history of dealings over the past 25 years laid out *supra*. This Court is loath to articulate the boundaries of what burden may exist with respect to proving potential claims constitute property in the United States within the meaning of section 109(a) and leaves that issue for another court to decide. Regardless, the FRs' Potential Claims certainly do not meet the burden as it has been considered by other courts that have faced the issue, and therefore this Court must conclude the FRs have failed to satisfy section 109(a).

## II. THE LEE 2001 BANKRUPTCY.

With respect to the Lee 2001 Bankruptcy, the FRs argue each of the requirements for recognition under section 1517 are satisfied and ask the Court to recognize the proceeding as a foreign main proceeding, or, in the alternative, as a foreign nonmain proceeding.[165] The Parties do not dispute section 109(a) is satisfied as Mr. Lee has clearly been shown to possess property in the United States at the time the petition for recognition was filed.

In opposition to recognition of the Lee 2001 Bankruptcy, Mr. Lee argues that proceeding does not constitute a foreign proceeding within the meaning of section 101(23) and therefore section 1517 is not satisfied.[166] Mr. Lee argues against foreign main recognition on grounds that Mr. Lee's COMI is allegedly in the United States, rather than Hong Kong.[167] With respect to foreign nonmain recognition, Mr. Lee argues there is no proof to maintain the FRs' position that Mr. Lee maintains an establishment in Hong Kong.[168] Finally, Mr. Lee argues the FRs' petition should be denied under the section 1506 public policy exception.[169]

---

[165] ECF No. 151, at 35.
[166] ECF No. 152, at 15.
[167] *Id.* at 5.
[168] *Id.*
[169] *Id.* at 14.

For the reasons described further below, the Court must deny recognition of the Lee 2001 Bankruptcy. The FRs failed to meet their burden of proving Mr. Lee's COMI is in Hong Kong, and therefore the Lee 2001 Bankruptcy cannot be a foreign main proceeding. The FRs also failed to meet their burden of proving Mr. Lee maintains an establishment in Hong Kong, and therefore the Lee 2001 Bankruptcy cannot be a foreign nonmain proceeding. Accordingly, because section 1517 is not satisfied, the Court need not and will not take a position on Mr. Lee's arguments with respect to section 1506.

### A. THE LEE 2001 BANKRUPTCY IS A FOREIGN PROCEEDING WITHIN THE MEANING OF SECTION 101(23).

The FRs argue the Lee 2001 Bankruptcy is an active foreign proceeding within the meaning of section 101(23) at the time the petition for recognition was filed.[170] According to the testimony of Mr. Ong, the FRs' expert on Hong Kong law, the Lee 2001 Bankruptcy constitutes an "active, collective judicial insolvency proceeding in Hong Kong" within the meaning of section 101(23).[171] Mr. Ong further testified that the discharge Mr. Lee received in his 2001 bankruptcy "[did] not end [Mr. Lee's] duties to the [HK High Court] and the FRs as a debtor under Hong Kong law," and that the FRs continue in their "efforts to realize upon assets and attend to [] other duties as representatives of the debtor['s] estate in Hong Kong (and elsewhere) until" Mr. Lee is discharged *and* his case is closed.[172]

Mr. Lee, through his own expert witness on Hong Kong law Mr. Cheng, offers little to refute the testimony of Mr. Ong or the FRs' argument.[173] Instead, Mr. Lee repeats that the discharge he received in 2005 should negate various factors within the seven-factor *Betcorp* test

---

[170] ECF No. 151, at 69–70.
[171] *Id.*
[172] ECF No. 80-5; ECF No. 151 at 70.
[173] ECF No. 55-13.

for determining whether a foreign proceeding exists within the meaning of section 101(23).[174]  The Court disagrees.

According to Mr. Ong, the Lee 2001 Bankruptcy is governed by the Bankruptcy Ordinance (Cap.6), Bankruptcy Rules (Cap.6A), and other relevant subordinate legislation of Hong Kong.[175]  According to Mr. Ong, despite Mr. Lee having received a discharge in 2005, the Lee 2001 Bankruptcy is not yet closed, as indicated by the active and pending S29 discovery orders issued by Justice Lam and Judge Man.[176]  This supports a finding that the Lee 2001 Bankruptcy is a "proceeding," "in a foreign country," that is "judicial or administrative in nature" within the meaning of section 101(23).[177]  *In re Betcorp Ltd.*, 400 B.R. at 277–78. Mr. Ong's comprehensive description of bankruptcy proceedings under Cap 6 of the Bankruptcy Ordinance readily supports a finding that those proceedings take into account the interests of all creditors, and that those proceedings provide creditors with a meaningful claims process.[178] Accordingly, the Court finds that the Lee 2001 Bankruptcy is "collective" within the meaning of section 101(23).

Mr. Lee's arguments with respect to the discharge essentially ask this Court to treat a discharge as causing a fundamental change in kind to the nature of a bankruptcy proceeding under Hong Kong law.  The testimony of Mr. Cheng does not support this contention but merely reiterates that Mr. Lee is free to earn money and make a living by virtue of having received the discharge.[179]  That Mr. Lee received a discharge, however, does not change the fact that certain assets would have been adjudicated in those proceedings had alleged wrongdoing not

---

[174] ECF No. 152, at 15.

[175] ECF No. 80-5, at 5–6.

[176] *Id.* at 15–16, Ex. B-8.

[177] According to the EU Regulation, a "proceeding" is comprised of "acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice."  *In re Betcorp Ltd.*, 400 B.R. at 277–78.

[178] *See generally* ECF No. 80-5.

[179] ECF No. 55-13.

occurred.[180]  Assuming *arguendo* Mr. Lee improperly transferred certain assets out of Hong Kong within the lookback period for fraudulent transfers under Hong Kong law, those assets assumedly would have been subject to the Lee 2001 Bankruptcy.  Regardless of this Court's findings with respect to whether those transfers in fact occurred, that Mr. Lee received a discharge does not negate a finding that his unclosed case before the HK High Court remains collective, and any additional assets the FRs recover in relation to that proceeding would be realized and distributed to creditors.

It may be true recognition under section 1517 is determined at the time of the filing of the petition for recognition.  And because of Mr. Lee's discharge, his debts in relation to that proceeding may no longer be subject to adjudication.  It makes little sense to this Court, however, to hold that an active bankruptcy proceeding is not a foreign proceeding within the meaning of section 101(23) merely because the debtor there was discharged of his debts, while his assets may still be subject to adjudication at a later date.  Accordingly, this Court finds that the Lee 2001 Bankruptcy is a foreign proceeding under section 101(23).  11 U.S.C. § 101(23).

## B.   THE FRs FAILED TO PROVE MR. LEE'S COMI IS HONG KONG.

The FRs urge the Court to recognize the Lee 2001 Bankruptcy as a foreign main proceeding, arguing Mr. Lee's COMI as of the date of the petition for recognition was Hong Kong.[181]   The FRs allege Mr. Lee moved to the United States for purposes of avoiding the pending Hong Kong bankruptcy proceedings, thereby manipulating his COMI in bad faith.[182]   Mr. Lee argues his domicile is in the United States, and therefore his COMI should presumably be here under section 1516(c).[183] Regardless of whether Mr. Lee's domicile is in the United States, the

---

[180] Assuming *arguendo* Mr. Lee engaged in any such wrongful conduct as the FRs allege.

[181] ECF No. 151, at 35.

[182] *Id.*

[183] ECF No. 152, at 5.

Court finds the FRs have not met their burden of proving his COMI is in Hong Kong and therefore must deny foreign main recognition.

In the case of an individual debtor, their "habitual residence…is presumed to be [their COMI]." 11 U.S.C. § 1516(c). While the Bankruptcy Code does not define "habitual residence," the Fifth Circuit has analyzed the term as "virtually identical" to the concept of "domicile" under United States law. *Ran-Circuit*, 607 F.3d at 1022. An individual's domicile is established by "physical presence in a location coupled with intent to remain there indefinitely." *See id.* (citing *Texas v. Florida*, 306 U.S. 398, 59 (1939)). One acquires a "domicile of origin" in the location of their birth, and that domicile continues until a new one (a "domicile of choice") is acquired. *Id.* (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 (1989)). "To defeat the presumption of continuing domicile, and establish a new domicile, an individual must demonstrate residence in a new state and an intention to remain in that state indefinitely." *Id.* (citing *Acridge v. Evangelical Lutheran Good Samaritan Soc'y*, 334 F.3d 444, 448 (5th Cir. 2003)).

Mr. Lee was evidently domiciled in Hong Kong prior to leaving there in 2016.[184] In the absence of Mr. Lee acquiring a new domicile-by-choice, Mr. Lee's domicile would presumably continue to be in Hong Kong. *Id.* Mr. Lee testified he has consistently been physically present in the United States since having arrived here in 2017.[185] Evidence of Mr. Lee physically residing in Pasadena, California and Sugarland, Texas, supports this.[186] That the home Mr. Lee lives at in Pasadena is titled to Hi Scene is not dispositive on the issue.

The more dubious question is whether Mr. Lee has demonstrated an intent to remain in the United States permanently. Mr. Lee testified he is in the process of acquiring United States citizenship and has

---

[184] *See supra* notes 31–65 (detailing Mr. Lee's history of dealings in Hong Kong and the PRC).

[185] *Lee Trial Testimony*, ECF No. 117, at 5 ¶¶ 23–25, 6 ¶¶ 1–24.

[186] ECF No. 59-3 (Mr. Lee's California and Texas drivers' licenses, listing the Pasadena and Texas homes, respectively as Mr. Lee's residences).

recently married someone in the United States—although no documentary evidence has been admitted with respect to either of these statements.[187]  Other facts potentially support a finding Mr. Lee intends to remain here permanently, including him having undergone the immigration process in the United States, having paid taxes and utility bills in California and Texas, having acquired driver's licenses here as well as a social security card and employment authorization and having started raising a new family here.[188]  Mr. Lee has also provided his travel records for both Hong Kong and the United States, which reflect he has not been to Hong Kong since August of 2019.[189]  This evidence is sufficient to support a finding that Mr. Lee has an intent to remain permanently in the United States, and that sometime between 2016 and 2024 he acquired a new domicile of choice here.  *Ran-Circuit*, 607 F.3d at 1023; *Mississippi Band of Choctaw Indians*, 490 U.S. at 109; *Acridge*, 334 F.3d at 448.  Therefore, Mr. Lee's COMI would ordinarily be presumed in the United States under section 1516(c).  11 U.S.C. § 1516(c).

Nonetheless, Mr. Lee's temporary visa status in the United States must be given weight when considering whether the COMI presumption has been rebutted.  *In re Loy*, 380 B.R. 154 at 163.  The FRs correctly point out Mr. Lee has only been able to stay in the United States on temporary work visas which necessarily have expiration dates.[190]  Despite having resided here for nearly 9 years, Mr. Lee has yet to acquire a green card or United States citizenship.[191]  If Mr. Lee's current or future visas were to expire without renewal, he would be forced to leave this country.  Accordingly, regardless of the Court's conclusion on domicile, Mr. Lee's temporary visa status constitutes evidence to the contrary that his COMI is in the United States, thereby rebutting the 1516(c) presumption.  *See id.* (presuming COMI in the UK because lapse

---

[187] *Lee Trial Testimony*, ECF No. 133, at 73 ¶¶ 9–15.

[188] ECF No. 59-1–6, 59-13–25; *Lee Trial Testimony*, ECF No. 133, at 74 ¶¶ 1–11.

[189] ECF No. 55-16–18.

[190] ECF No. 55-19–24; ECF No. 58-1–4; ECF No. 59-1–2.

[191] *See supra* notes 187, 188.

in debtor's United States visa necessarily required debtor to return there); *see also Ran-Circuit*, 607 F.3d at 1022–23 (finding COMI presumption rebutted despite otherwise concluding debtor's habitual residence was in the United States).

Application of the *SPhinX* factors also supports a finding the COMI presumption under section 1516(c) is rebutted. The location of Mr. Lee's primary assets is likely in the United States—but remains somewhat unclear based on the record to be sure. A majority of Mr. Lee's creditors who would be affected by this Chapter 15 case are in Hong Kong, having filed their claims and participated in the Lee 2001 Bankruptcy before the HK High Court there. Moreover, Hong Kong is the jurisdiction whose law would apply to disputes over any alleged fraudulent transfers that may have occurred.

Accordingly, we cannot rely on section 1516(c)'s presumption for determination of Mr. Lee's COMI, and instead must consider all evidence, "while keeping in mind that it is [the FRs'] burden to persuade the court by a preponderance of the evidence that [Mr. Lee's] COMI is in [Hong Kong]." *See Ran-Circuit*, 607 F.3d at 1023 (citing *Bear Stearns-District,* 389 B.R. at 335–36; FED. R. EVID. 301 ("explaining that a party's rebuttal of a presumption does not shift the burden of proof; rather, the risk of nonpersuasion remains upon the party on whom it was originally cast—in this case, [the FRs]")).

In the Court's view, however, the FRs have done little to satisfy this burden, other than to imply *ipse dixit* that because Mr. Lee lives and works in the United States temporarily, the Court should necessarily conclude his COMI is in Hong Kong. While true Mr. Lee would need to leave the United States upon the expiration of his visa, the FRs have not conclusively proven Mr. Lee's visa is subject to an impending lapse, nor that Mr. Lee would need to return to Hong Kong to renew it. Stated another way, the FRs have failed to show Mr. Lee will leave the United State and return to Hong Kong to renew the temporary work visas he relies on to stay here. *Cf. In re Loy*, 380 B.R. at 163) (concluding debtor's COMI was the UK because his temporary

visa was subject to lapse and he needed to return to the UK to renew it). Moreover, Mr. Lee has other avenues for remaining permanently in the United States, including pursuing citizenship, or marrying a United States citizen and starting the green card process. Again, Mr. Lee testified that he is pursuing at least one of those avenues.[192]  The fact that Mr. Lee's visa has been sponsored by his foreign employer Lion Legend is not dispositive on the issue of his COMI.  In total, the evidence fails to demonstrate Mr. Lee's COMI is in Hong Kong.

The FRs continue to come up short even after considering their COMI manipulation argument.  First, it should be noted that COMI manipulation analyses tend to focus on a debtor's manipulation of COMI to a different jurisdiction in attempts to manufacture a foreign main proceeding *there*.  *In re InterCement Brasil S.A.*, 668 B.R. 802 (Bankr. S.D.N.Y. 2025) (analyzing COMI shift from letterbox jurisdiction to debtor's "undisputed principal place of business" in Brazil); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. at 419 (analyzing COMI shift from PRC to Caymans); *In re Ocean Rig UDW Inc.*, 570 B.R. at 704 (analyzing COMI shift from the Republic of the Marshall Islands to Caymans); *In re Sunac China Holdings Ltd.*, 656 B.R. at 730–31 (analyzing purported COMI shift from Caymans to Hong Kong); *Fairfield Sentry-Circuit*, 714 F.3d at 138–39 (analyzing purported COMI shift from various jurisdictions to BVI).  This case involves the opposite factual pattern—Mr. Lee's purported COMI shift away from Hong Kong would serve to *negate* a finding that the Lee 2001 Bankruptcy was a foreign main proceeding.

Second, the FRs have not introduced sufficient evidence as to indicate whether "insider exploitation, untoward manipulation, [or the] overt thwarting of third-party expectations" took place.  *Fairfield Sentry-Circuit*, 714 F.3d at 138.  It may be true Mr. Lee left Hong Kong around the time the Lam S29 Orders were issued.  The record indicates, however, that Mr. Lee's move was justified by valid and reasonable purposes: to develop Roy Group investments in California and Texas,

---

[192] *See supra* note 187.

and to start a new life here.  Moreover, with respect to thwarting third-party expectations, the FRs were able to ascertain the location of Mr. Lee's purported residence in the United States *through an internet search*.[193]  The Court declines to find Mr. Lee's COMI shift from Hong Kong to the United States was done in bad faith.

Third, even if the Court were to agree Mr. Lee's immigration was a bad faith attempt to prevent creditors from readily ascertaining his COMI—which it does not—this would not outweigh the substantial evidence Mr. Lee introduced regarding his *bona fide* life here over the past 9 years.  *See Ran-Circuit*, 607 F.3d at 1024 (citing *Pennzoil Co. v. F.E.R.C.*, 789 F.2d 1128, 1136 (5th Cir. 1986) ("noting that a fact finder can still credit the evidence of the party in favor of whom the rebutted presumption operates despite the existence of contrary evidence and despite the resultant destruction of the presumption"); *see also In re Pirogova*, 593 B.R. at 414–15 (denying foreign main recognition and stating "[foreign debtor's] past conduct is not a factor the [c]ourt is required to consider in evaluating whether the [foreign proceeding] can be recognized as a foreign main proceeding").

After considering the totality of the circumstances in this case, including evidence of Mr. Lee's life in the United States and the insufficient evidence proving his COMI is elsewhere, the Court concludes the FRs failed to prove by a preponderance of the evidence Mr. Lee's COMI is in Hong Kong.  Accordingly, the Court must deny foreign main recognition as to the Lee 2001 Bankruptcy.

### C.   THE FRs FAILED TO PROVE MR. LEE HAS AN ESTABLISHMENT IN HONG KONG.

The FRs' argument that Mr. Lee maintained an establishment in Hong Kong through Lion Legend as of the date of the petition for

---

[193] *Tang Trial Testimony*, ECF No. 156 at 37 ¶¶ 12–16; ECF No. 2-10 (showing Staff Report from the Code Enforcement Commission in Pasadena, California, which allegedly revealed to the FRs the location of Mr. Lee in the United States).

recognition involves a three-step line of reasoning which the Court will address in turn.[194]

First, the FRs ask this Court to make a finding that Lion Legend as a company constituted an establishment in Hong Kong up through 2021. Mr. Lee previously stated in an affirmation to the HK High Court that Lion Legend had no activity in Hong Kong after the PRC Sale to White Horse occurred in 2017.[195] To the contrary, evidence indicates Lion Legend continued to conduct business in Hong Kong after 2017— at least through 2021.[196] The Lion Legend accounting ledgers, some of which were provided to the FRs by Lion Legend's accounting firm in Hong Kong CWC/Hyphen Asia (hereinafter "CWC/Hyphen"), reflect approximately HK$4 billion worth of debit and credit transactions between 2017 and 2021.[197] These transactions include payments to Mr. Lee, Roy Group subsidiaries in the United States (including Roy USA), Mr. Lee's wife, Ms. Wen, Sujida, various professional firms in Hong Kong including CWC/Hyphen, and payments to rent the office space Lion Legend occupied in Hong Kong.[198] The 2017 through 2021 ledgers also reflect what purports to be substantial investment transactions between Lion Legend and Hong Kong banks.[199]

Accordingly, sufficient evidence was introduced to support a finding that during 2017 through 2021, Lion Legend had a place of operations in Hong Kong which had a local effect on the marketplace,

---

[194] ECF No. 151.

[195] ECF No. 77-16, at 14 ¶ 32(c).

[196] ECF Nos. 61-2, 5, 7, 8; ECF Nos. 65-1, 4, 9, 12, 13, 14; ECF No. 77-12; ECF Nos. 78-17–20; ECF No. 118-1. Mr. Lee testified to this Court that Lion Legend has been in liquidating as of 2022. ECF No. 118-1. The Certificate of Incumbency Mr. Lee produced, however, indicate that as of July 18, 2024, Lion Legend was active and in good standing in the Caymans, with Suriya as Director and Sujida as Secretary. ECF No. 60-17; ECF No. 65-16. Evidence also indicates Lion Legend was registered as an active business entity in Hong Kong through April 22, 2025. ECF No. 118-1. Registration alone, however, is not dispositive on establishment. *In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. at 915.

[197] ECF Nos. 78-17–20.

[198] *Id.*

[199] *Id.*

and that it conducted nontransitory economic activity there. *See Brit. Am. Ins. Co. Ltd.*, 425 B.R. at 916 (concluding company had establishment in Saint Vincent and Grenadines because *inter alia* it conducted business, maintained accounts, and was involved in financial transactions in the local market there). Accounting ledgers after 2022,[200] however, were not introduced into evidence, leaving the Court to infer what business activity Lion Legend may have undergone in Hong Kong up until the petition for recognition was filed in 2024.

Second, the FRs attempt to connect Lion Legend to Mr. Lee. The FRs ask this Court to find Mr. Lee was directing and controlling Lion Legend between the time he originally immigrated to the United States in 2016, up through 2024, because he was purportedly acting as Chairman and Director of the company. According to the FRs' reasoning, if Mr. Lee was acting as director of that company—at least for the years 2017 through 2021—he necessarily would have had an establishment in Hong Kong.

It may be true Mr. Lee has misrepresented his relationship with Lion Legend in the past. For example, in 2016 Mr. Lee affirmed under oath to the HK High Court that he had "no relationship with Lion Legend,"[201] while in 2025 his daughter affirmed under oath to the same court that Mr. Lee was the director of that company in 2015.[202] In addition, documentary evidence shows that between the time Mr. Lee originally immigrated to the United States in 2016 up through 2022, he was listed as the Chairman and Director of Lion Legend in corporate documents which also contained his signature in such capacity.[203] The

---

[200] To the extent Lion Legend accounting ledgers were introduced for the year of 2022, those ledgers did not reflect the same level of financial transactions as had previously taken place between the years 2017 through 2021. ECF No. 77-12.

[201] ECF No. 67-4, at 4 ¶ 6.

[202] ECF No. 118-2, at 16 ¶ 40.2(c).

[203] ECF No. 61-3, at 3 (Lion Legend reports and consolidated financial statements for 2017 showing Mr. Lee as director); ECF No. 61-5, at 3 (Lion Legend reports and consolidated financial statements for 2018); ECF No. 61-6, at 6 (CWC/Hyphen audit engagement letter signed by Mr. Lee as director); ECF No. 61-8, at 3 (Lion Legend reports and consolidated financial statements for 2019 showing Mr.

FRs also sought to indirectly show Mr. Lee controlled Lion Legend because (i) his daughter Sujida, the purported director of Hi Scene and HSI, and purported secretary of Lion Legend, stated in a response to the Justice Man S29 discovery orders that she has little to do with these companies, and (ii) she has been a "housewife with four children" since 2016 "who relie[s] upon her family to assist with the day-to-day operations of the companies."[204]

The FRs' argument on step two, however, suffers from the same deficiency as their argument on step one: insufficient evidence was introduced directly showing Mr. Lee was acting as Chairman and Director of Lion Legend past 2022, let alone up and through 2024. Again, the Court is left to infer whether Mr. Lee was acting as the *de facto* director of Lion Legend at the time the petition for recognition was filed.

The FRs recognize the Court's conclusion on establishment hinges on inferences it must make with respect to Lion Legend's business dealings in 2024 and Mr. Lee's relationship therewith. The FRs' third step, accordingly, is to ask that the Court make such inferences negatively against Mr. Lee based on allegations he purposefully spoliated evidence by ordering the collection and destruction of relevant Lion Legend documents held by CWC/Hyphen.[205]

On November 26, 2024, Mr. Lee sent a letter to CWC/Hyphen purportedly directing the accounting firm to turn over all records in its

---

Lee as director); ECF No. 65-2, at 1 (Lion Legend 2020 certificate of incumbency showing Mr. Lee as director since 2017); ECF No. 65-3, at 20 (Lion Legend security transfer agreement from 2020, signed by Mr. Lee as director); ECF No. 65-4, at 3 (Lion Legend reports and consolidated financial statements for 2020 showing Mr. Lee as director); ECF No. 65-8 (Lion Legend directors' report, signed by Mr. Lee as director, dated April 14, 2021); ECF No. 65-7 (Lion Legend economic substance notification declaration for year 2021, showing Mr. Lee as director, signed December 21, 2022); ECF Nos. 78-17–20 (audited accounting ledgers and financial statements of Lion Legend from 2017 through 2021, showing "amounts due to director" being paid to Mr. Lee).

[204] ECF No. 56-3, at 7 ¶ 7(4); ECF No. 151., at 27.
[205] ECF No. 151 at 38.

possession relating to Lion Legend and other entities potentially associated with Mr. Lee—including Roy Group entities—to his nephew Suriya, a Managing Director of the Roy Group.[206]   Around the same time, Mr. Lee purportedly instructed Suriya to collect from CWC/Hyphen the Lion Legend documents pertaining to the relevant years before the accounting firm had a chance to fully comply with discovery requests pertaining to this Chapter 15 proceeding.[207] According to the FRs, Mr. Lee was aware of how crucial these documents would be to prove their establishment argument, which is why he orchestrated their collection and purported destruction before the FRs could use them in this case.   According to the FRs, Mr. Lee's conduct should therefore entitle them to a negative inference against him with respect to their establishment arguments.   The Court rejects the FRs' argument for two reasons.

First, the FRs presume the very fact they seek to prove by referencing Mr. Lee's purported document turnover order.   According to the FRs, Mr. Lee must have been in control of Lion Legend because why else would he direct CWC/Hyphen to turn over the documents? Simultaneously, the FRs point to the fact that Mr. Lee directed CWC/Hyphen to turn over the documents as proof Mr. Lee was in control of Lion Legend.

The FRs' arguments resemble a house of cards.   Much like the FRs other arguments with respect to foreign nonmain recognition, the FRs ask the Court to presume too much based on too little evidence, all while bearing the burden of proof.   Moreover, the FRs have not conclusively proven Suriya was acting as the agent of Mr. Lee when he purportedly collected documents of Lion Legend from CWC/Hyphen.   At trial Mr. Lee resisted the characterization that he "directed" Suriya to go to CWC/Hyphen and collect any records.[208]   The FRs did not submit any other evidence on the matter as to prove Suriya was acting as Mr.

---

[206] ECF No. 66-6, at 3.
[207] ECF No. 66-8.
[208] *Lee Trial Testimony*, ECF No. 133 at 19 ¶¶ 3–22, 20 ¶¶ 1–5.

Lee's agent at the time but instead rely on the November 26 letter as a crutch that shows Mr. Lee must have had some control over Lion Legend simply because he directed the CWC/Hyphen to turn over documents relating to the company.  If Suriya was not acting as Mr. Lee's agent, why is it relevant Mr. Lee instructed Suriya to collect the Lion Legend documents from CWC/Hyphen?  Once again, the FRs ask the Court to presume Mr. Lee was in control of Lion Legend first, then use inconclusive and contingent factual findings to backfill their reasoning. The Court remains unconvinced.

Second, and more importantly, Mr. Lee may have had a valid alternative justification for ordering the collection of Lion Legend documents from CWC/Hyphen, which the FRs do not adequately address.  "Spoliation of evidence 'is the destruction or significant and meaningful alteration of evidence.'"  *See Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010)).  "We permit an adverse inference against the spoliator…only upon a showing of 'bad faith' or 'bad conduct,'" which generally means "destruction for the purpose of hiding adverse evidence." *See id.* (citing *Condrey v. SunTrust Bank of Georgia*, 413 F.3d 191, 203 (5th Cir. 2005); *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)).  "'Bad faith' is a question of fact like any other, so the trier of fact is entitled to draw any reasonable inference." *Mathis,* 136 F.3d at 1155.

Given Mr. Lee's relationship with Lion Legend as a former-director/current-manager was crucial to the outcome of the petition for recognition, Mr. Lee either was on notice or should have known any recent documents relating to his dealings with Lion Legend were relevant to this litigation.  Accordingly, Mr. Lee had a duty to preserve. *Guzman v. Jones*, 804 F.3d at 713.

When questioned at trial as to the November 26 letter to CWC/Hyphen and his instructing Suriya to collect the Lion Legend documents, Mr. Lee admitted the motivation behind his conduct was a purported data leak that might expose "Roy Asset [*sic*]" (the Roy Group)

to insider trading risks.[209]  Mr. Lee has been accused of and found liable of insider trading in the past.[210]  In the Court's view, it is reasonable to infer that Mr. Lee's motivation for ordering the collection of the Lion Legend documents was to minimize future liability associated with insider trading violations, rather than hiding adverse evidence relating to his alleged control over Lion Legend up and through 2024.  *See Mathis*, 136 F.3d at 1155–56 (upholding magistrate court's finding that destruction of evidence was not done in bad faith and upholding its denial of adverse inference against would-be spoliator).  Contrary to what the FRs may believe, just because Mr. Lee "does not follow the trades of Roy Asset"[211] does not mean he is not justified in his concerns about issues relating to insider trading and potential data leaks of the company's financial records and information—particularly in light of his previous exposure.

As such, the Court declines to afford the FRs a negative inference against Mr. Lee with respect to any purported connection he may have had with Lion Legend as of the date the petition for recognition was filed.  Any business activities of Lion Legend that may have occurred in Hong Kong in 2024 cannot serve as a basis for this Court to conclude Mr. Lee maintains an establishment there, because the FRs have not conclusively proven Mr. Lee was the director of that company on the date of the petition for recognition.

As an alternative argument, the FRs attempt to characterize Lion Legend as Mr. Lee's economic lifeline to the United States.[212]  According to the FRs, Mr. Lee's reliance on Lion Legend for his employment, salary, and visa indicate he maintains an economic connection, if not an establishment in Hong Kong.  This argument also fails for two reasons.

First, Mr. Lee's employment as a manager of Lion Legend is not dispositive on the issue of whether he maintains an establishment in

---

[209] *Id.* at 20, ¶¶ 8–25; ECF No. 77-15, at 3.
[210] ECF No. 67-19.
[211] *Lee Trial Testimony*, at 21 ¶¶ 8–15.
[212] ECF No. 151, at 52.

Hong Kong.[213]   *Ran-Circuit*, 607 F.3d at 1027 (analogizing a corporate debtor's "place of operations" to an individual's "place of employment in the country where the [foreign representative] claims the [debtor] has an establishment").   Mr. Lee may be employed by Lion Legend, but he evidently performs his work in the United States, and his work evidently relates to United States-based Roy Group subsidiaries that own and control Roy Group real estate investments here, including various investments projects in Houston.[214]   Mr. Lee's employment by Lion Legend and work *in the United States* does not prove he has a "place of employment" *in Hong Kong*, let alone an establishment there.   *Id.*   The fact that he has received payments from Lion Legend for his role as manager[215] also does not convert his employment in the United States into an establishment in Hong Kong.

Second, Mr. Lee's participation in the L1-A visa program does not prove he maintains an establishment in Hong Kong.   The L1-A visa program purportedly requires participation of at least one "qualifying organization abroad," which does business that is "regular, systematic, and continuous."[216]   That Mr. Lee relies on Lion Legend as the requisite "qualifying organization abroad" still does not prove *Mr. Lee* conducts such business in Hong Kong, nor does it prove he maintains a place of employment there nor conducts nontransitory economic activity there. Once more, the FRs seem to conflate Mr. Lee's employment as a manager of Lion Legend in the United States with economic activity Lion Legend as a company may or may not undergo in Hong Kong.

In the Court's view, the FRs' evidence fails to meet the "rather high" bar of proving Mr. Lee maintained an establishment in Hong Kong as of July 19, 2024, the date the petition for recognition was filed.   *Ran-Circuit*, 607 F.3d 1027–28.   Accordingly, the Court must conclude the FRs have failed to prove the Lee 2001 Bankruptcy is a foreign nonmain proceeding within the meaning of section 1517(b)(2).   Given the FRs

---

[213] ECF No. 65-6, at 1 (showing Mr. Lee's employment at Lion Legend as general manager, as of November 4, 2021).

[214] *Lee Trial Transcript*, ECF No. 117, at 17 ¶¶ 1–7.

[215] ECF No. 65-6.

[216] 8 C.F.R. 214.2(l)(1)(ii)(G), (H).

have failed to prove the Lee 2001 Bankruptcy is either a foreign main or foreign nonmain proceeding, the requirements for recognition under section 1517(a) have not been satisfied, and the Court must deny recognition of that proceeding under Chapter 15.

<h2 style="text-align:center">CONCLUSION[217]</h2>

For the foregoing reasons, the Court denies recognition of both the Siu-Fung Group liquidation proceedings as well as the Lee 2001 Bankruptcy.

Mr. Lee's counsel is directed to settle an order regarding recognition and separate orders regarding all the related motions, consistent with this opinion, within 14 days.

SIGNED 02/10/2026

Alfredo R Pérez
United States Bankruptcy Judge

---

[217] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

66 / 66